# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RONICA R. TABOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 09-CV-189-GKF-FHM |
| HILTI, INC., a domestic for profit business | ) |
| corporation, and HILTI OF AMERICA, | ) |
| INC., a foreign for profit business | ) |
| corporation, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment of defendants Hilti, Inc. and Hilti of America, Inc. (collectively, "Hilti") against plaintiff Ronica Tabor ("Tabor") (Dkt. #95).

### I. Summary Judgment Standard

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F3d 664, 670 (10th Cir. 1998). A court must examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show

that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670. In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## II. Tabor's Claims for Relief

Tabor alleges a "disparate impact" theory of alleged sexual discrimination in promotions in her first claim for relief. In her second claim for relief, Tabor alleges Hilti engaged in an intentional "pattern and practice" of sexual discrimination in promotions.[1] The parties agreed in a hearing on the record held September 22, 2011, that Tabor alleges two violations of Title VII in her third claim for relief: first, Tabor was denied a promotion due to intentional sex discrimination, and second, Hilti

---

[1]The first two claims for relief are brought on behalf of both a putative class and Tabor individually. The court denied the Motion for Class Certification on September 21, 2010. (Dkt. #93). It appears the law permits an individual to advance a disparate impact theory of recovery, *see Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 991 (1988) (permitting a disparate impact approach when "the employer's practices may be said to 'adversely affect [an individual's] status as an employee, because of such individual's race, color, religion, sex, or national origin.'" (citing 42 U.S.C. § 2000e-2(a)(2)) (brackets in original). It also appears the law permits an individual employee to pursue a pattern and practice claim, *see* Charles R. Richey, MANUAL ON EMPLOYMENT DISCRIMINATION LAW AND CIVIL RIGHTS ACTIONS IN THE FEDERAL COURTS § 1:30 (West, 2nd ed. 2011).

demoted her and denied her the opportunity to interview for other positions in retaliation for complaining about a Division Manger's inappropriate gender-based comments. Tabor's fourth claim is for intentional infliction of emotional distress.

### III. Material Facts

Tabor began work at Hilti as a Hilti Center Representative in January 2006. Tabor worked as an inside sales person in Dallas, Texas, where she sold tools, products, and supplies. In October 2006, Tabor transferred to Hilti's Customer Service Department in Tulsa, Oklahoma. Tabor initially desired to promote to a Team Leader position in Customer Service, but by the third quarter of 2007 she expressed interest in promoting to an Account Manager ("AM") position in outside sales. Account Managers travel to construction sites and other external locations to demonstrate Hilti products and make sales.

On November 14, 2007, Tabor interviewed for an AM position which was described as serving Oklahoma City. Tabor did not receive that promotion. A genuine dispute of material fact exists as to whether the OKC position remained open and was later offered to a male applicant, Clifford Kidwell, on April 8, 2008, or whether the position was relocated to Tulsa and awarded to another female applicant named Paulette Musso. (Dkt. #117-5; Dkt. #117-8; Dkt. #95-7, pp.13-14; Dkt. #95-8, pp.34, 40). Tabor interviewed with Division Manager Glen Teel ("Teel") and Regional Manager David Perkins ("Perkins") on November 14, 2007, for the AM position. During the interview, Tabor was informed of a second AM position opening up in Arkansas. Tabor "let them know that, you know, if worse come to worse, I would be willing to possibly start at another

3

university if I had to relocate to a different area." (Dkt. #117-1, p.22).[2] It is undisputed Teel and Perkins received an email from Tabor on November 26, 2007, in which Tabor stated she would be willing to relocate to Arkansas. There is a genuine dispute of material fact as to whether Berkeley Smith, an male applicant from outside the company, was offered the Arkansas position before or after Tabor expressed her willingness to relocate to Arkansas.[3] Tabor did not receive the Arkansas position, and it was filled by Berkeley Smith.

During the interview, Teel allegedly told Tabor tools "are like guns for men" and using them is "almost like second nature," but for a woman it would take work to learn the tools and it would be something she would have to work on at home or on the job. Tabor says Teel asked her if she would be okay with traveling despite having a one year old child, and stated he "couldn't imagine if his wife was in that position and had to travel." She further claims Teel said that "because of product knowledge it may be a disadvantage to be a woman but then it could also have its advantages, and said that there may be some customers that wouldn't talk to a man but that being a woman those customer[s] may give [a woman] an opportunity to talk with them." Tabor was upset by the interview and reported it to her supervisor Jennifer Patuto that day. Tabor met with Human Resources representatives the following day to discuss what she felt were improper aspects of the

---

[2]Tabor alleges she expressed her mobility and willingness to move to Arkansas in other Hilti documents, but none of them predate the interview.

[3]Hilti argues the position was offered to Berkeley Smith immediately following the interview, before Tabor communicated her willingness to relocate to Arkansas. The only evidence Hilti cites is Perkins' statement he does not remember when Smith was offered the position, but would not dispute it if Teel testified the offer had been made after the interview. (Dkt. #95-8, p.48). No citation to any such testimony by Teel is provided by Hilti. The Applicant Flow Log indicates Hilti offered the Arkansas position to Berkeley Smith on December 12, 2007. (Dkt. #117-11). Thus, there is a genuine dispute of material fact as to whether Tabor applied for the position prior to it being awarded to Berkely Smith.

4

interview. (Dkt. #117-13, p.2). Tabor alleges she was told by a Human Resources representative eleven days later "to just brush it under the rug, move on, start fresh, it would not impact my future with the company and to just not speak of it again." *Id.*

Prior to the interview, Tabor had been rated P1.[4] The official P-rating was set by Tabor's direct supervisor, Jennifer Patuto. Teel and Perkins were unaware of Tabor's P-rating going into the interview. In their written interview evaluation, Teel and Perkins rated Tabor P2 (a designation meaning "[r]eady for next development step within 12-24 months"). Although Tabor has not disputed that her official Priority status rating of P1 did not change in Hilti's Strategic Management Development ("SMD") Program, a genuine dispute of material fact exists as to whether Tabor's rating changed to P2 relative to her application for an AM position. (Dkt. #95-5, p.34; Dkt. #95-4, p.34). Tabor remained in Customer Service after not being selected for the AM position.

Following the interview, Tabor sought an opportunity to do more field training. During the period Tabor sought field experience, however, no customer service employees were permitted to go on field training because the department was short-handed and field training typically lasted one to two weeks.

Tabor states that, following the interview, she became depressed and sought medical attention, that she was prescribed medication for depression, that she experienced anxiety, loss of sleep, loss of appetite, an upset stomach, and was highly emotional. Tabor resigned from Hilti on April 5, 2008.

---

[4] A P1 rating is the highest rating for promotion, and means "[n]eed for next development step within 12 months."

## IV. The Disparate Impact Claim

Hilti moves for summary judgment on Tabor's disparate impact claim, and references the court's Order denying the motion for class certification. Although the order denying class certification addresses Rule 23 issues, which are separate and distinct from issues raised by the motion for summary judgment on Tabor's disparate impact claim, the issue of the reliability and adequacy of plaintiffs' statistical evidence is relevant to the summary judgment inquiry. Federal Rule of Civil Procedure 56(a) requires the entry of summary judgment "if a party that would bear the burden of persuasion at trial does not come forward with sufficient evidence on an essential element of its prima facie case." *Adler*, 144 F.3d at 670.

"[A] plaintiff establishes a prima facie disparate-impact claim by showing that the employer 'uses a particular employment practice that causes a disparate impact' on one of the prohibited bases." *Lewis v. City of Chicago, Ill.*, 130 S.Ct. 2191, 2197-98 (2010) (citing *Ricci v. DeStefano*, 129 S.Ct. 2658, 2672-73 (2009)). For a plaintiff to state a *prima facie* case of disparate impact through the use of statistics "it is not enough for Plaintiffs to show simply that . . . men get a higher percentage of . . . assignments than their percentage in the work force. They must compare *qualified* men to *qualified* women." *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1194 (10th Cir. 2006) (emphasis in original).

Tabor argued at the class certification stage and in her response to the motion for summary judgment that the court should consider a "feeder pool" statistical analysis which compares the number of males and females in inside sales who were promoted to outside sales. In denying class certification, this court concluded the plaintiffs had failed to demonstrate how their statistics could be reliably applied because the feeder pool statistics did not take account of whether males and

6

females in inside sales have the same level of qualification for, interest in, and eligibility to promote to outside sales. (Dkt. #93, p.6).

There is evidence in the record that substantial differences exist between inside and outside sales positions at Hilti. "Relatively few Customer Service employees wish to pursue careers as outside sales account managers primarily because relocation is almost always required." (Dkt. #78-2, p.1). There are different job expectations between inside and outside sales. For example, account managers work outside in the elements, carry heavy equipment on job sites, work at construction sites, and must be proactive sellers with good time management, planning, and face-to-face communication skills. *Id.* Tabor offers no relevant evidence[5] that her proposed "feeder pool" of employees in inside sales are qualified for and interested in outside sales positions. *See Carpenter*, 456 F.3d at 1196 ("[S]tatistics must, however, relate to the proper population. For example, when the claim is disparate impact in hiring, the statistics should be based on data with respect to persons qualified for the job"). "To be sure, the population selected for statistical analysis need not perfectly match the pool of qualified persons," but it must "adequately reflect[] the population of qualified persons." *Id.* at 1197. "Nevertheless, absent a close fit between the population used to measure disparate impact and the population of those qualified for a benefit, the statistical results cannot be persuasive." *Id.* Instead of demonstrating the "close fit" between the proposed feeder pool and those eligible to promote to AM, Tabor attempts to shift her burden to make a *prima facie* case and argues it is Hilti who must prove inside sales personnel are not necessarily qualified for and interested in promotion to outside sales. Such an approach would reverse the burden of proof for disparate impact

---

[5]The only evidence Tabor cites is the deposition of Musso for the inapposite statement that Musso found outside sales in pharmaceuticals to be similar to outside sales for Hilti. She makes no conclusion as to the similarity or dissimilarity between inside and outside sales at Hilti.

claims set forth in *Carpenter*, 456 F.3d at 1194.⁶  The court finds Tabor has failed to present reliable statistical evidence of disparate impact.  Tabor has therefore failed to establish a *prima facie* case, and the motion is granted on Tabor's first claim for relief.

**V. The Pattern and Practice Claim**

"Pattern-or-practice cases are typically tried in two or more stages. During the first stage of trial, the plaintiffs' 'burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers.'" *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001) (citations omitted).  In the second stage, "it must be determined whether each individual plaintiff was a victim of the discriminatory practice. Importantly, by having prevailed in the first stage of trial, the individual plaintiffs reap a significant advantage for purposes of the second stage: they are entitled to a presumption that the employer had discriminated against them." *Id.* (citations omitted). "During the first stage of a pattern-or-practice case, for example, a summary judgment motion (whether filed by plaintiffs or defendants) must focus solely on whether there is sufficient evidence demonstrating that defendants had in place a pattern or practice of discrimination during the relevant limitations period." *Id.* at 1109.  A plaintiff

---

⁶Tabor urges the court to follow the Seventh Circuit on this issue. *See E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302 (7th Cir. 1988).  *Sears,* in relevant part, challenged promotion practices from non-commission to commission based sales positions. *Id.* at 319-20. *Sears* is factually distinguishable, as this case addresses promotion between internal customer service and sales positions and outside sales positions.  *Sears* is also legally distinguishable because it is a pattern and practice case where the plaintiff had to prove intentional discrimination, not disparate impact. *Id.* at 308.  Finally, the statement in *Sears* that it was not the plaintiff's burden to demonstrate interest and qualifications is arguably dicta. *Id.* at 334.  To the extent Tabor contends the court should reject the requirements of *Carpenter* in favor of the Seventh Circuit's stance in *Sears,* the court declines to do so.

8

may use statistics to establish the elements of a pattern and practice claim: "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." *Carney v. City and County of Denver*, 534 F.3d 1269, 1275 (10th Cir. 2008) (citing *Hazelwood Sch. Dist. v. U.S*, 433 U.S. 299, 307-08 (1977)). However, statistical evidence is insufficient if it "is not limited to a qualified applicant pool. This makes it impossible to discern whether any discrimination has in fact occurred." *Id.* at 1275; *see also* Charles R. Richey, Manual on Employment Discrimination Law and Civil Rights Actions in the Federal Courts § 1:30 (West, 2nd ed. 2011). Thus, to establish a *prima facie* case for her pattern and practice claim, Tabor must offer statistics which demonstrate discrimination in the promotion of qualified individuals.

Tabor has not alleged a policy or practice of Hilti which is facially discriminatory, and thus she must rely on statistics to prove that Hilti's promotions policy, *as applied*, is discriminatory. As the court discussed above, Tabor has failed to present reliable statistics showing the "feeder pool" of inside sales personnel were actually qualified for positions in outside sales. Because Tabor's evidence is not limited to a qualified applicant pool, it is impossible to discern whether any discrimination has in fact occurred. Therefore, the motion is granted as to Tabor's pattern and practice claim.

## VI. The Failure to Promote Claim

A. Alleged Direct Evidence of Discrimination

Tabor argues she has presented direct evidence of employer discrimination and the *McDonnell Douglas* test is therefore inapplicable. *Ramsey v. City and Cnty. of Denver*, 907 F.2d

9

1004, 1007 (10th Cir. 1990); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). However, the *McDonnell Douglas* test is inapplicable only when there is direct evidence of discrimination, not where there is only direct evidence of personal bias. *Ramsey,* 907 F.2d at 1008 (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1984)). For example, in *Ramsey*, the plaintiff's supervisor "testified to his feelings about women being better suited to some jobs than to others." *Id.* To show direct evidence of discrimination, "the evidence would need to show that [the supervisor] acted on his discriminatory beliefs." *Id.* A supervisor's private opinions "do not constitute direct evidence of discriminatory *conduct* . . . The plaintiff must show that the employer actually relied on her gender in making its decision. In making this showing, stereotyped remarks can certainly be *evidence* that gender played a part." *Id.* (Emphasis in original).

Here, Tabor claims the questions and comments made during her interview with Teel and Perkins are direct evidence of discrimination. At most, the alleged statements are indirect, rather than direct, evidence Tabor was affected by sexual discrimination. Tabor presents no other direct evidence of discrimination. Therefore, the *McDonnell Douglas* test applies.

B. The *McDonnell Douglas* Test

Under the *McDonnell Douglas* test, a plaintiff who lacks direct evidence of intentional discrimination "bears the initial burden of establishing a prima facie case by a preponderance of the evidence." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000). A plaintiff has the burden of establishing the following elements:

> (i) that [s]he belongs to a [protected class]; (ii) that [s]he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite [her] qualifications, [s]he was rejected; and (iv) that, after [her] rejection, the position

remained open and the employer continued to seek applicants from persons of complainant's qualifications."

*McDonnell Douglas*. 411 U.S. at 802. At the prima facie stage, the plaintiff's burden is "'not onerous,' which is evidenced by the 'small amount of proof necessary to create an inference of discrimination.'" *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (citations omitted).

By establishing a *prima facie* case, "the plaintiff raises a rebuttable presumption that the defendant unlawfully discriminated against her." *EEOC,* 220 F.3d at 1191. "The burden of production then shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff." *Id.* "If the defendant is able to articulate a facially nondiscriminatory reason for the adverse employment action, the plaintiff can avoid summary judgment only if she can show that her '[membership in a protected class] was a determinative factor in the defendant's employment decision, or show the defendant's explanation for its action was merely pretext.'" *Id.* (quoting *Atchley v. Nordam Group, Inc.*, 180 F.3d 1143, 1148-49 (10th Cir. 1999)).

Tabor has established the first *prima facie* element–as a female she is a member of a protected class. Tabor has established the second element because she has produced evidence she received a P1 rating from her direct supervisor. Tabor was rejected for the OKC position, and there exists a genuine dispute of material fact as to whether she timely expressed interest in the Arkansas position which she did not receive. Thus, she has established the third element. After her rejection, one position arguably remained open and the other was filled by a male, which fulfills the fourth element. Therefore, Tabor has demonstrated a *prima facie* case of sex discrimination.

After the plaintiff establishes a *prima facie* case, a defendant "must then articulate a legitimate, nondiscriminatory reason for the adverse employment action suffered by the plaintiff. If the defendant is able to articulate a valid reason, the plaintiff can avoid summary judgment only if she is able to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual." *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999). Hilti argues there was a legitimate, non-discriminatory reason for not promoting Tabor: she was insufficiently qualified for the AM positions. Teel and Perkins stated Tabor did not possess the skills to promote to outside sales at the time of her interview and ranked her as P2; the evidence is sufficient to meet Hilti's burden of production.

When an employer has articulated a legitimate, non-discriminatory reason for an adverse employment decision, "[a] plaintiff can withstand summary judgment by presenting evidence sufficient to raise a genuine dispute of material fact regarding whether the defendant's articulated reason for the adverse employment action is pretextual. A plaintiff can show pretext by revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason.'" *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) (citations omitted).

Tabor argues that due to the alleged sexually discriminatory comments made by Teel during the interview, a reasonable jury could find her poor evaluation and rejection for promotion were motivated by sexual discrimination. For the purposes of summary judgment, the court must accept the comments attributed to Teel during the interview were made. At least some of these comments

implied Teel believed women to have inferior natural skill with tools, and that females' lack of product knowledge could be a hindrance in some circumstances in the field.

Tabor does not contest Teel gave her positive rankings in her interview relating to her personal skills and qualities. (Dkt. #95-12; 95-7, p.28). Teel describes Tabor as "very competitive," a "high performer," and possessing "ambition and dedication to her development. Great job!" Tabor was rated as "acceptable" in the category of "Working with Others" and "more than acceptable" in "Getting Things Done" and "Develop Yourself and Others."

The negative aspects of the interview examine Tabor's perceived weaknesses in: Time and Territory Management, knowledge of sales launch strategies, and knowledge of the business including core trade applications and construction site etiquette. The concerns expressed by Teel are specific and practical, and unrelated to generalized concerns over gender. Teel states Tabor "[s]howed best understanding of the [Interior Finishing] trade core applications, but struggled with [the other] core applications." (Dkt. #95-12, p.9). Far from contesting this conclusion, Tabor states: "Interior Finish I was – I felt like that I was really solid on, but there was some other product lines that were – it was just – you didn't sell them every day." (Dkt. #117-1, p.28). Tabor further admits she "struggled with a few of the applications" because she had not had enough time in the field to learn them. *Id.* at 29. At no point does Tabor present any evidence she was sufficiently acquainted with the technical and business requirements of the account manager position. She also does not present any evidence she was more qualified than Smith or Musso in those areas. Despite Tabor's lack of technical and business knowledge, the evaluation states that with some further development Tabor would "be ready for the AM role." (Dkt. #95-12, p.10).

The court's "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." *Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Services*, 165 F.3d 1321, 1330 (10th Cir. 1999). Even taking as true the allegations that Teel made some inappropriate remarks during the interview, the evidence is insufficient to show that Tabor had yet acquired sufficient business and technical knowledge for the account manager positions. No genuine dispute of material fact exists as to whether Hilti's articulated reason is pretextual. Therefore, the court finds no reasonable factfinder could rationally find that Hilti's justification for not promoting Tabor was pretextual. The motion is granted as to Tabor's second claim for failure to promote.

## VII. The Retaliation Claim

Tabor alleges in her third claim for relief that, after she complained to Human Resources about her interview with Teel, she was demoted and denied the opportunity to interview for other positions within the company. "To state a prima facie case of retaliation, [the plaintiff] must demonstrate that: (1) she engaged in protected opposition to discrimination; (2) [the defendant] took an adverse employment action against her; and (3) there exists a causal connection between the protected activity and the adverse action." *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004); *Jones v. Barnhart*, 349 F.3d 1260, 1269 (10th Cir. 2003).

Tabor satisfies the first prong of the test because she approached her supervisor and Human Resources personnel about her interview with Teel.

As for the second prong – an adverse employment action by Hilti – Tabor was not actually "demoted" as she alleges. It is undisputed she kept her job in Customer Service following her

14

complaints. She acknowledges "[i]t was not a demotion. I was still in the same job." (Dkt. #95-4, p.27). However, she argues Hilti took an adverse employment action against her because Teel and Perkins rated her a P2 on their interview evaluation, "thus making [Tabor] ineligible to promote [to AM] for 12-24 months."

As mentioned above, Hilti contends Tabor remained a P1 in the official records of the SMD (Strategic Management Development) program, and that Teel's interview evaluation was merely a comment which had no effect on Tabor. However, it makes no difference for the purpose of analyzing the retaliation claim. Assuming, *arguendo*, that Teel's and Perkins' interview evaluation effectively changed Tabor's Priority status from P1 to P2 in connection with promotion to AM, the action occurred immediately following Tabor's interview, *before* Tabor approached her supervisor or Human Resources to complain about the interview. It is uncontested Teel and Perkins did not learn of Tabor's complaint until November 20, 2007. Teel's P2 rating occurred days before, and therefore could not have been in retaliation for Tabor's complaint.

Tabor responds that the evidence is nonetheless sufficient to raise an inference of retaliation, for three reasons: 1) Hilti *kept* her in P2 status; 2) she was not allowed to apply for another promotion; and 3) she was denied opportunities for field coverage.

If in fact Tabor was "kept" in P2 status between her interview on November 14, 2007 and her resignation in April, 2008, this fact cannot constitute an adverse employment action taken in retaliation for her complaints because her status allegedly changed immediately following the interview. To "keep" Tabor in P2 status is not an adverse employment *action*, as her situation remained unchanged from before her complaints. Thus, Tabor's complaints about the interview did not provoke retaliation in that manner.

15

Tabor has not shown retaliation on the grounds she was not permitted to apply for another promotion, as she provides no evidence of a position she wanted or for which she attempted to apply. Tabor claims she could not apply for promotion because of the P2 evaluation, but as discussed above, the P2 evaluation was not retaliatory. Therefore, not only has Tabor failed to show she was denied the ability to apply for any specific promotion, but any restriction on her ability to apply for a promotion was imposed prior to her complaints and was thus not retaliatory.

Finally, Tabor cannot successfully claim she was denied field coverage opportunities in retaliation for her complaints. The record is replete with evidence that Teel, Perkins, and Patuto all wanted to see Tabor further develop her skills so she could promote to an AM position. It is undisputed, moreover, that during the period Tabor sought an opportunity to do more field training, no Customer Service employees were permitted to go on field training because the department was short-handed, and field training typically lasted one to two weeks.[7] Because noone in Tabor's Customer Service department was permitted to go on field training from November 2007 through June 2008, the fact she was not permitted to go on such training does not constitute evidence of retaliation for her complaints.

Tabor has failed to show the existence of a causal connection between the protected activity and the alleged adverse action. Hilti is therefore entitled to summary judgment on Tabor's retaliation claim.

---

[7]Tabor attempts to dispute this, but she fails to show a genuine dispute of material fact. The evidence before the court is that, in November of 2007, Berkeley Smith (a male) completed a one-day ride-along as part of a job offer, not as field training. (Dkt. #120-2, p.2). Tabor stated some men were permitted to do field training, but as a basis for this conclusion she states only that an unnamed man told her he had gone on field training. (Dkt. #95-4, p.19). This inadmissible hearsay does not create a genuine dispute of material fact.

## VIII.  The Claim for Intentional Infliction of Emotional Distress

"To recover damages for intentional infliction of emotional distress, a plaintiff must prove: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *Computer Publ., Inc., v. Welton*, 49 P.3d 732, 735 (Okla. 2002).

The trial court acts as a gatekeeper regarding the outrageousness of the defendant's conduct. *Id.*  The court "must determine whether the defendant's conduct *may* reasonably be regarded *so extreme and outrageous* as to permit recovery." *Breeden v. League Services Corp.*, 575 P.2d 1374, 1377 (Okla. 1978) (emphasis added).  To satisfy the second element, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* at 1378.  "In general, a plaintiff must prove that the recitation of defendant's conduct to an average member of the community would arouse the listener's resentment against the defendant and would lead the listener to exclaim 'Outrageous!'" *Welton,* 49 P.3d at 735.

Tabor's evidence does not meet this standard.  No reasonable jury could consider the alleged discriminatory statements made during the interviews or otherwise to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency," or "atrocious and utterly intolerable in a civilized community."  Thus, defendants are entitled to summary judgment on Tabor's claim for intentional infliction of emotional distress.

## IX. Conclusion

For the reasons set forth above, Hilti's Motion for Summary Judgment is granted as to the five claims raised in Tabor's first, second, third, and fourth claims for relief.

WHEREFORE, defendants' Motion for Summary Judgment against plaintiff Ronica Tabor (Dkt. #95) is granted.

IT IS SO ORDERED this 23rd day of September, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma