IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA


RONICA TABOR,                    )
                                 )
            Plaintiff,           )
                                 )
-vs-                             )  No. 09-CV-189-GKF-PJC
                                 )
HILTI, INC.,                     )
                                 )
            Defendant.           )



TRANSCRIPT OF TRIAL PROCEEDINGS

TESTIMONY OF MARK KILLINGSWORTH

**BEFORE THE HONORABLE GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE**

JUNE 25, 2013



A P P E A R A N C E S


     **Daniel E. Smolen and Lauren G. Lambright**,
Attorneys at Law, Smolen, Smolen & Roytman, 701 South
Cincinnati Avenue, Tulsa, Oklahoma, 74119, attorneys
on behalf of the Plaintiff;

     **J. Daniel Morgan**, Attorney at Law, Newton,
O'Connor, Turner & Ketchum, 15 West 6th Street, Suite
2700, Tulsa, Oklahoma, 74119, attorney on behalf of
the defendant.



*REPORTED BY:*          *BRIAN P. NEIL, RMR-CRR*
                        *United States Court Reporter*

2

1                        I N D E X

2

3                        WITNESSES

4

        Name                                        Page
5
    *MARK KILLINGSWORTH*
6
        Direct Examination by MR. SMOLEN              3
7       Voir Dire Examination by MR. MORGAN         71
        Voir Dire Examination by MR. MORGAN         98
8       Cross-Examination by MR. MORGAN            116
        Redirect Examination by MR. SMOLEN         134
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Tuesday, June 25, 2013
 2                         *  *  *  *  *
 3              MR. SMOLEN:  Your Honor, we'd call Dr. Mark
 4    Killingsworth.
 5                    MARK KILLINGSWORTH,
 6    after having been first duly sworn, says in reply to
 7    the questions propounded as follows, to-wit:
 8              THE COURT:  Sir, if you would state your
 9    full name for the record, please.
10              THE WITNESS:  Yes.  Mark Robert
11    Killingsworth.
12              THE COURT:  Thank you.  Mr. Smolen, you may
13    inquire.
14                    DIRECT EXAMINATION
15    BY MR. SMOLEN:
16    Q.    Good morning, Dr. Killingsworth.
17    A.    Morning.
18    Q.    I'd like to cover some preliminary matters with
19    you.  Could you please briefly summarize your
20    education background after high school?
21    A.    Yes.  I was undergraduate at the University of
22    Michigan and I did graduate work getting a Ph.D at the
23    University of Oxford.
24              THE COURT:  Go Blue.
25              THE WITNESS:  Yes.
```

1  Q.    *(BY MR. SMOLEN)*  Do you have an education and

2  training in statistics?

3  A.    Yes.

4  Q.    What is the extent of the education and training

5  that you have?

6  A.    Well, I took several courses in undergraduate.  I

7  took a course and did a thesis as a graduate student

8  that involved a lot of statistics, and I now teach a

9  course in statistics called "applied

10 microeconometrics," which I would define short and

11 briefly as the application of statistics to questions

12 in economics, especially microeconomics, economics of

13 individual actors, firms, consumers, workers, that

14 sort of thing.

15 Q.    And I believe you'd indicated, but are you

16 presently employed?

17 A.    Yes.

18 Q.    Okay.  And tell the court in what capacity that

19 you're employed.

20 A.    Well, I'm a professor of economics at Rutgers

21 University.

22 Q.    Okay.  You had indicated that you teach a course

23 in microeconometrics --

24 A.    Yes.

25 Q.    -- correct?

1    A.    Yes.

2    Q.    Okay.  Do you use that in your work as well?

3    A.    Yes.

4    Q.    Okay.  And please tell the court how you use that

5    in your work.

6    A.    Well, in a variety of ways.  I guess just as an

7    example, some years ago I was part of a team that was

8    studying the effect of a so-called welfare cap on

9    welfare recipients.  Previously in New Jersey, if you

10   were on welfare and you had another child -- this is

11   AFDC welfare -- your welfare grant was increased.  And

12   as an experiment, some people were randomly chosen to

13   continue on that, other people were randomly chosen to

14   be subject to a cap on benefits.  So even if they had

15   another child while they were on welfare, their

16   benefit would not be increased.

17          So we did several things.  We did simple

18   statistics to try and gauge whether the experimental

19   group and the control group, so to speak, were

20   different from one another, and we also did a large

21   number of regressions; in fact, similar to the ones

22   I've done here, so-called Cox semiparametric

23   regressions.

24   Q.    Okay.  Have you authored any peer-reviewed

25   publication's?

1   A.    Well, yes.  That was published in the Journal of

2   Labor Economics a few years ago and it has both kinds

3   of studies, the relatively simple ones and also the

4   Cox semiparametric regressions.

5   Q.    Have you written any peer-reviewed publications

6   concerning discrimination in the labor market?

7   A.    Yes.

8   Q.    Prior to your engagement here, have you ever been

9   asked to testify as an expert before?

10  A.    Yes, I have.

11              THE COURT:  Just curious.  With regard to

12  your AFDC study, did you take into consideration the

13  jumping to Social Security once welfare limits were

14  increased?

15              THE WITNESS:  I think that in the era in

16  which we were doing this that wasn't an issue.

17              THE COURT:  It is now?

18              MR. YASSER:  Yes.  Well, these were all

19  basically quite young women, and so Social Security in

20  the sense of retirement was not a concern.

21              THE COURT:  Well, of course, you've got

22  other Social Security benefits as well.

23              THE WITNESS:  Yes.

24              THE COURT:  All right.  Go ahead.

25              THE WITNESS:  Oh, and we did -- there were

1    data on things like food stamps, and that certainly

2    figured in what we were doing.  Because, in fact, food

3    stamps help offset some of the -- some of the cap.

4    Because if you were on food stamps, your food stamp

5    allowance would be increased even though the welfare

6    grant was not.

7              THE COURT:  Yeah.  Totally irrelevant here,

8    but the recent focus on once the welfare benefits

9    started declining, Social Security disability started

10   going up.

11             THE WITNESS:  Oh, yes.  Oh, yes, yes.  The

12   disparity component is getting bigger and bigger.

13             THE COURT:  Mr. Smolen.

14             MR. SMOLEN:  Thank you, Your Honor.

15   Q.   *(BY MR. SMOLEN)*  Have you ever been asked to

16   testify before Congress?

17   A.   Yes.

18   Q.   Explain to the court when you've testified and

19   what you testified about before Congress.

20   A.   Well, I think there were a couple of occasions.

21   One was on immigration legislation.  This is at the

22   time of not Simpson-Bowles, but the Alan Simpson the

23   Wyoming senator, was the leader, I think, of the

24   judiciary committee who wanted to change the welfare

25   laws in the '80s -- pardon me -- immigration laws in

1   the '80s.

2          And then secondly, I testified on something

3   called "pay equity" before the joint economic

4   committee of the Congress.

5   Q.   Okay.  The plaintiff engaged you as an expert

6   witness in this case; correct?

7   A.   Yes.

8   Q.   Did the plaintiff ask you to conduct any specific

9   analysis?

10  A.   No.  I think my report said that the plaintiff or

11  plaintiff's counsel asked me to study promotions from

12  inside sales feeder jobs to outside sales but didn't

13  request a specific type of analysis.

14  Q.   Okay.

15          MR. SMOLEN:  Your Honor, I need to get a

16  copy of Mr. Killingsworth's report.

17          THE COURT:  Yes.

18          MR. SMOLEN:  Simon, could you pull

19  Plaintiff's Exhibit 1 up, please?

20          THE COURT:  Mr. Smolen, I might ask here

21  before we get into this:  Have you and Mr. Morgan

22  stipulated to the relevant time period?  I know that

23  Mr. Killingsworth had done a revised analysis focusing

24  on the period from October 18th, 2007, to December

25  31st, 2008.  Is there any sort of stipulation here as

1    to that?

2                MR. SMOLEN:  We have not had a stipulation

3    as to that.  I'm happy to try to work that out, but I

4    also know that I can briefly cover that with a few

5    questions.

6                THE COURT:  All right.

7    Q.    *(BY MR. SMOLEN)*  Dr. Killingsworth, there's also

8    a plaintiff's exhibit book if it's easier for you to

9    actually handle the report in a written format, and

10   it's the first exhibit.

11        And specifically looking as the paragraph 3,

12   does that indicate to you what the plaintiff asked you

13   to do in this case?

14   A.    Yes.

15   Q.    And what was that?

16   A.    Well, as it says there, to look -- basically, as

17   I said before, to look at disparities in the rates of

18   promotion by sex from so-called inside sales to

19   so-called outside sales.

20   Q.    Prior to this case, had you conducted any

21   statistical analysis similar to the analysis you

22   conducted in the case at bar?

23   A.    Yes.  Well, in fact, I mentioned the Journal of

24   Labor Economics paper about the welfare cap or

25   the -- and the statistical technique, although

1    obviously not the subject matter was just the same,

2    Cox proportional hazards regression.

3         I guess as sort of a starting point, there are

4    in this report, Exhibit 1, a number of simple

5    descriptive statistics, and they're somewhat similar

6    again in terms of the technique used to what appears

7    in a portion of the Journal of Labor Economics paper.

8    Q.    Okay.  And I'm assuming that in the previous

9    study you included the same methodology that you

10   included in this case?

11   A.    The same or very, very similar, yes.

12   Q.    Okay.  What type of data did you review in

13   conducting your analysis in this case?

14   A.    Well, here, primarily I looked at the so-called

15   SAP data.

16   Q.    Okay.  Did you also look at the applicant flow?

17   A.    I did.

18   Q.    And did you also look at the company's SMD data?

19   A.    Correct.  I did, yeah.

20   Q.    What is your understanding as to what the SAP

21   data was?

22   A.    Well, the SAP data are in three parts.  There are

23   little tabs that you can click on.  One part was about

24   earnings; another part was about qualifications, which

25   was largely empty buckets, not a whole lot was filled

1   in; and then finally -- and I saw this on the screen

2   with one of the previous witnesses -- the tab that I

3   spent the most time with was about essentially

4   employee -- employment histories at Hilti and it had

5   other information we saw.  It had job location, job

6   title and so forth, and it gave the job title

7   chronologically through time from the date of hire, or

8   roughly speaking 2005 if somebody had been hired a

9   long time before, up to roughly 2008 or thereabouts.

10           MR. SMOLEN:  Simon, let's go ahead and pull

11  up Exhibit 6, if you would, please, the database that

12  Dr. Killingsworth is referring to.  And, Simon, could

13  you search the name Rocco Belmonte and then zoom that

14  in for the court, please?  Probably bring that back

15  down to 100 or 150.  I would just stick with 100.

16  That way we don't have to --

17  Q.    (*BY MR. SMOLEN*)  Okay.  There's an employee here

18  by the name of Rocco Belmonte.  And we're going to

19  scroll from left to right, and I just want you, if you

20  would, to clarify to the court what those columns are

21  the information that we've got contained?

22  A.    Right.  Well, it gives his name; his ID number,

23  which I guess is a company ID number; his gender;

24  race; date of birth; marital status; I guess this is

25  his home address; DOE, I believe his date of entry or

1    hire date; DOT is date of termination.  Tenure is

2    measured as of some point.  That's just the difference

3    between whatever the reference date is and the date of

4    entry.  The effective date refers to the date on which

5    some event occurred.  And the action type tells you

6    what kind of event it was, was it a hire, was it a

7    transfer, was it something else.

8    Q.    Okay.

9    A.    In this case, he went through hiring, a transfer,

10   and organizational reassignment.  And the

11   organizational reassignments occurred at different

12   dates, June 1st of 2007, you see that on the effective

13   date column, and then another one on 1/1 of '08 and

14   there are two entries for that.

15   Q.    Okay.  And it indicates that there was an

16   organizational reassignment; correct?

17   A.    Right.

18   Q.    Which do you term that to be a -- go to the right

19   a little bit.  Keep going.  And he goes from a

20   wage-earner to a territory sales rep, AM II, in the

21   field sales.  Do you see that there on April 1st of

22   2007?

23   A.    I do, yeah.

24   Q.    Okay.  And did you consider that to be showing a

25   promotion from an inside sales wage-earner position to

1   outside sales, AM II, in the field sales department?

2   A.   Yes, I did.

3            MR. SMOLEN:   Your Honor, when we were --

4   just real quick, we were on a break, Mr. Morgan, he

5   had agreed to take out the objections on the applicant

6   flow log exhibits so that we didn't have to have

7   Melissa Harris come authenticate them.

8            MR. MORGAN:   That's fine.

9            MR. SMOLEN:   Now there's no objection to

10  that, so we would move to admit the exhibits.

11  Q.   *(BY MR. SMOLEN)*  And while we're looking for

12  that, Dr. Killingsworth, it shows that he was a Hilti

13  center rep; correct?

14  A.   Correct.

15  Q.   And then he promotes to an AM II position?

16  A.   Correct.

17  Q.   And that SAP data gives us the exact date that

18  that takes place?

19  A.   That's right.  April 1st of 2007.

20  Q.   Okay.

21           MR. SMOLEN:   We'd move to admit Exhibit 69

22  through 72.

23           THE COURT:   For the record, any objection?

24           MR. MORGAN:   Let me confirm that that's the

25  correct numbers.

1          MR. MORGAN:   69 through 60 --

2          THE COURT:   69 through 72.

3          MR. MORGAN:   That's fine.

4          MR. SMOLEN:   No objection?

5          MR. MORGAN:   No objection.

6          THE COURT:   Very well.   Plaintiff's Exhibit

7    69 through 72 inclusive are admitted.

8    Q.   *(BY MR. SMOLEN)*   And, Dr. Killingsworth, I'd like

9    to take you through the next step just briefly before

10   we get back into the SAP data so the court can kind of

11   see how you actually physically did this analysis.

12          Did you then look to see if Rocco Belmonte, for

13   example, would have -- whether he appeared in the

14   applicant flow data?

15   A.   Yes.

16   Q.   Okay.

17          MR. SMOLEN:   And, Simon, if you could pull

18   those exhibits up.

19   Q.   *(BY MR. SMOLEN)*   And show the court how you did

20   that.

21   A.   Actually before we leave the SAP data --

22   Q.   We're going to get back into it.

23   A.   Oh, sure.   But for purposes of answering this

24   question, I would just mention that, as we just saw,

25   there's a name, and it was Rocco Belmonte, II or

1    something like that.  Maybe -- yeah, Rocco J.

2    Belmonte, II, and it also gave an ID number, 25990.

3         And in other contexts, I would hope, if I did an

4    analysis of this kind, to be able to find exactly the

5    same name and/or exactly the same ID number in some

6    other data set because that makes it very easy to

7    merge the two.  Social Security number would be

8    another example.  Employers don't like to hand those

9    out, of course, so instead you typically get an ID

10   number.

11        But unfortunately, one of the problems with the

12   applicant flow logs is the spelling of names is not

13   consistent from one source to another, and there's no

14   ID in the applicant flow logs the way there is in the

15   Hilti data.

16   Q.   Okay.

17   A.   So I don't remember offhand if Rocco J. Belmonte

18   II appears in precisely that way, but we'll find out

19   in just a minute, I guess.

20   Q.   Okay.

21   A.   But I couldn't go to that ID number for him

22   because it's not there --

23   Q.   Okay.

24   A.   -- in the applicant flow log.

25   Q.   You had to search by name?

1    A.    Correct.

2    Q.    Okay.  And searching 2005's applicant flow log --

3    A.    Well, I'd go to the home tab at the top and then

4    over on the right you can find -- find and select.

5    And by the way, is this the entire applicant flow logs

6    for all four years?

7    Q.    This is just '05.

8    A.    Oh, okay.

9    Q.    I'm just going to try to show the court how you

10   did it.

11            MR. SMOLEN:  And this is the only example

12   we're going to use, Judge Frizzell.  I just wanted to

13   be clear how he searched the applicant flow log to

14   show that he was in there.

15   A.    Right.  So I would start by typing in "Belmonte,"

16   the last name.

17   Q.    Yes.

18   A.    The less selective you are the more likely you

19   are to get a hit.  If I typed in "Rocco J. Belmonte

20   II," it might not have worked.

21   Q.    Okay.

22   A.    Then if we can click on "find all" in case there

23   are variants of the name, well, no data.

24   Q.    Okay.  So that told you that he was not in the

25   '05 applicant flow log?

1  A.    Correct.  And I wouldn't have expected him to be
2  because he didn't have this promotion until 2007.
3  Q.    Okay.  So let's look at -- you would agree with
4  me that he could have applied in '06 but been given
5  the position in '07?
6  A.    Well, we wouldn't know about it, at any rate,
7  because there's nothing about him in the 2005 --
8  Q.    We know he didn't apply in '05?
9  A.    Well, we don't know that.  We know he doesn't
10  show up in the applicant flow data.
11  Q.    Okay.
12  A.    But that's different from saying we know he
13  didn't apply.
14  Q.    Okay.  For one reason or the other, he was not in
15  the applicant flow data --
16  A.    Correct.
17  Q.    -- in '05?
18  A.    Correct.  He does not appear.
19  Q.    Let's look up '06 and '07.  Or I could simply ask
20  you, Dr. Killingsworth, to speed this up, did you
21  check his name in '06 and '07 and '08's applicant flow
22  log?
23  A.    Yes.
24  Q.    And did you ever find it?
25  A.    No.  He doesn't appear under any variant of his

1    spelling and certainly not with his ID because the

2    applicant flow logs don't have ID.

3    Q.   Okay.  And let's look at -- then did you check to

4    see -- for purposes of coming up with your rebuttal

5    expert report, did you look to see if the company

6    tracked any qualifications with the employee Rocco

7    Belmonte who had clearly promoted from inside sales to

8    outside sales in the relevant time frame?

9    A.   Oh, I forget.  I think the so-called PMP, which

10   is in the SAP data, there's a space for that but I

11   don't think it's populated in his case.

12   Q.   Let's take a look.

13            MR. SMOLEN:  Simon, if we could pull up the

14   SMD data.  And, Simon, instead of opening the files,

15   just search -- like do a find and see -- because I

16   know his name appears in one of the files, I just

17   don't know which one it is.  Give me one second:

18   Q.   *(BY MR. SMOLEN)*  So we find Mr. Belmonte II,

19   Rocco?

20   A.   Right.

21   Q.   We find him in the Exhibit 79, the February '06

22   customer service department SMD data; correct?

23   A.   Right.

24   Q.   And then did you look to see what qualification

25   data had been maintained for Mr. Belmonte?

1    A.    Yes.

2    Q.    And can you show the court -- first, let's look

3    at the columns on the top so we can see what

4    categories we're dealing with.

5    A.    I think I recognize the far one.

6    Q.    There we go.  There we go.  We've got it on the

7    screen now.

8    A.    Yeah.

9    Q.    And we can track Mr. Belmonte, we know that he's

10   entered into the system; correct?

11   A.    Yes.

12   Q.    As of February '06; correct?

13   A.    That's right.  He's right there, yeah.

14   Q.    There he is.  And did you find that Mr. Belmonte

15   had an assigned P code?

16   A.    No.  Well, at least it's not given there.

17   Q.    Okay.

18   A.    Now, that's blank.  That's column I under last P

19   code.

20   Q.    Okay.  And did you look to see if he had been

21   assigned an M code?

22   A.    No.  That's blank too.

23   Q.    Okay.  And moving to the right, did Mr. Belmonte

24   have any of his PMP data entered into the SMD file?

25   A.    No, no.  That's blank as well.

1   Q.    And --

2   A.    Wait.  We lost him, or did we?  Is that 265?

3   Yeah.

4   Q.    Right.  And the last entry in PMP was from 2005

5   where there's an M rating; correct?

6   A.    Right.  For meets expectations, I think.

7   Q.    Right.  We used Mr. Belmonte here in court for an

8   example to illustrate to the court how you did your

9   analysis.

10       Did you find that this was a consistent pattern

11   in looking at the data when you identified those who

12   promoted, did you consistently find that they were not

13   in the applicant flow log?

14   A.    Well, I would say that much more often than not

15   they weren't available in the applicant flow data.

16   Q.    Okay.  And then in looking at the SMD data, was

17   it consistent that you found that the majority of

18   those promoted did not have SMD information that had

19   been entered into that system?

20   A.    I'm not sure I can quantify it as precisely as

21   that, but I would say it's quite widespread, more than

22   just a handful, more than just 10 percent, a lot.

23            THE COURT:  Now, in terms of Mr. Belmonte

24   here, given that this is a February 2006 SMD database,

25   we wouldn't have PMP for 2006, 7, or 8; correct?

```
 1                    THE WITNESS:  Right, right.
 2                    THE COURT:  So it does have 2005 PMP?
 3                    THE WITNESS:  That's right.
 4                    THE COURT:  All right.  Go ahead.
 5                    MR. SMOLEN:  And, Your Honor, just for
 6       clarification, I can walk him through all the other
 7       SMD data that was provided, but this is the only SMD
 8       file that Mr. Belmonte appeared in.  He did not appear
 9       in the '07 or the '08, but I can certainly go through
10       that to show the court that he doesn't appear in that.
11                    THE COURT:  I don't know if that's
12       necessary here.  Mr. Morgan.
13                    MR. MORGAN:  He can put on his case however
14       he tries it.
15                    THE COURT:  All right.  Whatever you'd like
16       to do.
17                    MR. SMOLEN:  Simon, could you show just for
18       purposes to satisfy the court that Mr. Belmonte does
19       not appear in the other SMD data which has already
20       been preadmitted.  I believe they're exhibits -- and
21       they're Exhibits 74 through 78, Simon.  And just, if
22       you would, show the court that you're searching
23       Belmonte.
24                    MR. MORGAN:  Your Honor, we'll stipulate
25       that Mr. Belmonte doesn't appear in the customer
```

1    service SMD records.  He wasn't a customer service
2    employee.
3              MR. SMOLEN:  Okay.
4              THE COURT:  All right.  Thank you, sir.
5    Q.   *(BY MR. SMOLEN)* Dr. Killingsworth, did the SAP
6    data contain information relevant to the analysis that
7    we asked you to perform?
8    A.   Oh, yeah.  In several ways.
9    Q.   Okay.  And what information was that?
10   A.   Well, first and perhaps foremost, it was a record
11   of people's employment histories so I could go into
12   those and see who was in -- who was initially in
13   inside sales and then who was promoted to outside
14   sales.
15        It also had gender, it had race, it had date of
16   birth from which I could get age, it had date of hire
17   from which I could get time at Hilti, so it had a
18   variety of different things.  Oh, and it also
19   indicated the area people were working in at Hilti.
20   Q.   Okay.  I'd like you to look at Plaintiff's
21   Exhibit 41, if you would, please.
22   A.   Yes.
23             THE COURT:  Before we do that, Mr. Morgan's
24   statement here and stipulation does beg, I think, an
25   interesting question and perhaps an important

1    question.

2         To the extent that you were reviewing the CS

3    department SMD data in Exhibits 74, 75, 76, 77, 78,

4    79, does that affect your conclusions?  I had perhaps

5    understood that the SMD data that you contend that you

6    could not find these people in was the entire gamut of

7    Hilti, and Mr. Morgan's pointing out that these

8    databases are simply SMD data for customer service.

9              THE WITNESS:  Oh, that's right.  But then

10   in that case, I have no SMD data for anybody else, if

11   that's the case.

12             THE COURT:  Yes.

13             THE WITNESS:  I'd want to go back and

14   check.  I guess the basic point is, if you wanted to

15   look at people's promotability, mobility, and so

16   forth, you would want to do it for all the people who

17   might potentially get into outside sales rather than

18   just for one small group within it -- or I shouldn't

19   say small -- rather than just one single group within

20   the potential field.

21             THE COURT:  All right.  And since our

22   feeder group is CS, then I take it you don't need to

23   look beyond the CS SMD data?

24             THE WITNESS:  Well, I would say that the

25   feeders, as far as I have seen, include but aren't

1    limited to the CS group.  And so therefore -- and yet,

2    if it's the case that the SMD data are only available

3    for the CS group, then you can't take account of that

4    for anyone else.  I'm not even sure that it's possible

5    to take account of SMD information for all of the CS

6    people, just for the people for whom that happens to

7    have been filled in.  Am I being clear?

8              THE COURT:  Oh, I understand that.

9              THE WITNESS:  In other words, the problem

10   is not just that we may not have anything for people

11   other than CS.  The problem is also that for people

12   who are in CS, we don't always have something.

13             MR. SMOLEN:  I think I can clarify --

14             THE COURT:  Just so I understand some of

15   the complexities here, are you satisfied that at least

16   the CS SMD data attempted to bring in Hilti service

17   center people?

18             THE WITNESS:  My understanding is that it

19   was -- that was the frame of reference, but whether it

20   included how widespread the information actually

21   filled in was fell short of 100 percent.

22             MR. SMOLEN:  Your Honor, I can help clarify

23   this, I promise.

24             THE COURT:  All right.

25             MR. SMOLEN:  Exhibit 80, which was the base

1    2008 SMD completion, which is one of the files we just

2    searched, that was the SMD data for the entire base

3    market.

4                 THE COURT:  All right.

5                 MR. SMOLEN:  We searched everything that

6    was given to us by Hilti, which the 2008, it's Exhibit

7    80, it says base --

8                 THE COURT:  Why don't we get this from the

9    witness rather than your testimony.

10                MR. SMOLEN:  Okay.

11                THE COURT:  Go ahead.

12   Q.    *(BY MR. SMOLEN)*  Dr. Killingsworth, you reviewed

13   as part of your expert report both the customer

14   service department SMD data -- correct? --

15   A.    Right.

16   Q.    -- as well as what we've marked as Exhibit 80,

17   the base 2008 SMD completion data; correct?

18   A.    Okay.  I don't think I saw it exactly by that

19   name, but yes.

20   Q.    Okay.  Going back to Exhibit 41, do you recognize

21   that exhibit?

22   A.    Yes.

23   Q.    And what is Plaintiff's Exhibit 41?

24   A.    Well, that's a tabulation of the account managers

25   who I would call outside sales, AM II or above, as of

1   January 1st, 2008.

2   Q.   Okay.  And what specific data did you rely on in

3   creating Plaintiff's Exhibit 41?

4   A.   That was the SAP data.  That gave me the

5   opportunity to do a snapshot of account managers,

6   AM IIs and above.

7   Q.   Okay.

8        MR. SMOLEN:  Your Honor, we'd move to admit

9   Plaintiff's Exhibit 41.

10       THE COURT:  Any objection?

11       MR. MORGAN:  I'm sorry.  41?

12       MR. SMOLEN:  Yes, sir.

13       MR. MORGAN:  I think it's irrelevant, Your

14   Honor, because it doesn't speak to just the customer

15   service department, which is at issue in this case,

16   it's only outside sales.  This doesn't have anything

17   to do with promotions.  This just shows the population

18   of who was in outside sales.  This is *Joe's Crab Shack*

19   No. 1 is the ruling precedent on that.  This has

20   nothing to do with our case.

21       THE COURT:  Response?

22       MR. SMOLEN:  Your Honor, it just

23   establishes that the number of employees in inside

24   sales and number of employees in outside sales and

25   that's the foundation that we look at.  Again, it

1    doesn't necessarily pertain to a statistical

2    regression analysis, but it just establishes what the

3    roles were on inside sales and outside sales in the

4    relevant time frame.

5              MR. MORGAN:  Your Honor, I don't see

6    anything that distinguishes anything about inside

7    sales in this entire exhibit.  It's all account

8    manager II, account manager III, account manager IV,

9    V, territory representative.  Those are all outside

10   sales positions.

11             MR. SMOLEN:  It shows the population in

12   outside sales positions by gender for that time

13   frame.

14             MR. MORGAN:  That is not an issue in this

15   case.

16             *(Discussion held off the record)*

17             THE COURT:  Mr. Smolen, what I'm trying to

18   get at here is, in Plaintiff's 41, we're looking at

19   account managers who came from both inside sales and

20   those who may have applied from outside; correct?

21             MR. SMOLEN:  Correct, Your Honor.  We're

22   looking at the number -- just the number of account

23   managers as of 2008, how many positions that the

24   company had in account manager.

25             THE COURT:  Okay.  But for statistical

1   relevance here, because we are comparing the female

2   versus male applicants from inside sales, okay, as

3   it's been defined, don't we need to limit this outcome

4   to those who applied from inside sales?

5           MR. SMOLEN:  This table isn't about the

6   progression from inside sales to outside sales.  It's

7   simply about how many account manager positions were

8   there in 2008, not who was promoted or that they're

9   external or internal.

10          THE COURT:  I understand.  But how is that

11  relevant here to a disparate impact case where we're

12  focusing on the disparity between male and female

13  promotions from inside sales?

14          MR. SMOLEN:  It just establishes that once

15  they get into outside sales, the disparity increases.

16  You've got --

17          THE COURT:  But that's not what this case

18  is all about.

19          MR. SMOLEN:  We can move on past it.

20          THE COURT:  The objection's sustained.

21          MR. SMOLEN:  Okay.

22          THE COURT:  Let me just make sure, I don't

23  want to error here.

24      But you understand, sir, that as I understand

25  it, we're trying to compare the disparate impact of

1    what the plaintiff contends to be the defendant's

2    employment practices on promotions from inside sales,

3    which include pro shops and Hilti service centers as

4    well as customer service, to account manager

5    positions.  But as I understand it, we can't compare

6    those people who applied from those three areas, in

7    what we have loosely called inside sales, to the total

8    globe -- the total number of account managers but only

9    those account managers who applied from inside sales;

10   correct?

11            THE WITNESS:  Yes, absolutely.  I think in

12   my report, I just said this is background.  That's

13   all.

14            THE COURT:  All right.  Well, it seems to

15   me to be irrelevant.  Go ahead.

16            MR. SMOLEN:  Okay.

17   Q.   (*BY MR. SMOLEN*)  Okay.  Dr. Killingsworth, did

18   you look at SAP data concerning promotions from inside

19   sales positions to outside sales positions?

20   A.   Yes.

21   Q.   Okay.  Did you analyze the SAP data?

22   A.   Yes.

23   Q.   How did you treat the inside sales positions for

24   purposes of this analysis?

25   A.   Well, I treated them as the feeder group, or as a

1    set of feeder groups, and asked who starts off as of

2    either January 1st, 2005, or is hired into a so-called

3    feeder group after that, how did they fair in terms of

4    ultimately getting or not getting into outside sales.

5    Q.    Okay.  And why did you treat the inside sales

6    positions as the feeder group?

7    A.    Well, I guess two reasons.  First of all, I had

8    seen various documents that said that they were; and

9    secondly, it was clear from the data that they were.

10          They're not the only feeder group.  There are

11   various other kinds of jobs, and occasionally you do

12   see somebody promoted into outside sales from one of

13   those other titles.  But the bulk of the promotions

14   from -- or into outside sales clearly come

15   from -- wait a minute.  I misspoke.  The bulk of the

16   promotions to outside sales clearly come from inside

17   sales --

18   Q.    Okay.

19   A.    -- people in inside sales titles.

20   Q.    And that was consistent with the documents that

21   you reviewed that have been produced by Hilti, those

22   written documents?

23   A.    Yes.

24   Q.    And when you looked at the data, that also lined

25   up with that promotion process from inside sales to

1    outside sales as being the feeder group; correct?

2    A.    Yes.  Yeah.

3    Q.    And the positions that you identified in your

4    analysis as being inside sales positions, do you

5    recall what those were?

6    A.    Well, there are a variety of them.  Actually on

7    the previous table, AM II through IV or V, or titles

8    like territory rep with something else in it, were

9    typical outside sales titles.  And the name CS rep or

10   pro shop rep or something similar to that were typical

11   inside sales titles.

12   Q.    Okay.  If you would, look at Plaintiff's Exhibit

13   42.  Tell the court, if you would, Dr. Killingsworth,

14   what Plaintiff's Exhibit 42 is.

15   A.    Yes.  Well, this looks at people by seniority or

16   by time with the company as of 2005, or as of the date

17   of hire, whichever is later.  It tabulates for people

18   in each category, either hired before January 1st of

19   2005 or hired in any of the subsequent years, what

20   percentage of men, what percentage of women were

21   promoted to outside sales.  These are all people who

22   started off in inside sales as of the indicated date.

23   Q.    Okay.  So Plaintiff's Exhibit 42 represents a

24   subset of Hilti's SAP data that we just discussed?

25   A.    Correct.  Well, just the SAP data in fact.

1    Q.    Correct.

2    A.    Yeah.

3              MR. SMOLEN:  Your Honor, I move to admit

4    Plaintiff's Exhibit 42.

5              THE COURT:  Right.  Just before -- is this

6    something then that you created, Mr. Killingsworth?

7              THE WITNESS:  The table is, yes.

8              THE COURT:  All right.  Any objection?

9              MR. MORGAN:  Yes, Your Honor.  This doesn't

10   have any -- I mean, this is just raw numbers.  It

11   doesn't have anything to do with who sought a

12   promotion.  If it doesn't relate to those who were

13   seeking promotion, then it's completely irrelevant.

14   Who was interested in the job, I mean, just the raw

15   numbers are meaningless.  And it includes --

16             THE COURT:  But as I understand,

17   Mr. Morgan, this is Dr. Killingsworth's analysis of

18   those who were actually promoted to outside sales from

19   inside sales; correct?

20             MR. MORGAN:  Well, as he defined inside

21   sales.  That's not how we define inside sales, and I

22   think that's a rather large issue in this case.

23             THE COURT:  Well, all right.  For ease of

24   use, let's say inside sales includes the customer

25   service people, the Hilti reps, and the pro shop

1   people, all right?

2        So is that what this represents, Doctor?

3            THE WITNESS:  Yes.

4            THE COURT:  All right.  So just for ease of

5   use here, how is that not relevant to this lawsuit?

6            MR. MORGAN:  Because it doesn't focus on

7   those who actually applied or sought the position or

8   indicated an interest in promoting in the future to

9   the outside sales jobs.

10           THE COURT:  But this represents the people

11  who were actually promoted from how we define inside

12  sales; correct?

13           MR. MORGAN:  From how -- from what you just

14  defined as inside sales, I would agree with that.

15           THE COURT:  Yes.  All right.  Any response?

16           MR. SMOLEN:  Just that these are the actual

17  promotions that happened from inside sales to outside

18  sales.

19           THE COURT:  Seems to me that this is

20  clearly part of the picture, it's relevant.

21  Plaintiff's Exhibit 42 is admitted.

22           MR. SMOLEN:  Thank you, Your Honor.

23  Q.    *(BY MR. SMOLEN)*  So, Dr. Killingsworth, I want

24  you to explain to the court what Exhibit 42 shows with

25  respect to promotions from inside sales to outside

1    sales, please.

2    A.    Okay.  Well, I first went into the SAP data and

3    identified all the people who were present in inside

4    sales titles as of -- well, in this first block of

5    text, who were present as of January 1st, 2005, so

6    they'd all been hired before that date.  And there

7    were 468 men in inside sales titles at that point and

8    132 women in inside sales titles.  As of that date,

9    the men had a little bit more than three years of

10   service at Hilti, the women had about 3.6 years of

11   service at Hilti.

12        So then I looked forward into the data, starting

13   in 2005, and asked, well, all right, of those 468 men,

14   how many were subsequently promoted into outside

15   sales?  And the answer was 124 of them ultimately were

16   promoted into outside sales.  They were 26 percent

17   of -- 26 and a half percent of those men then got a

18   promotion.  124 is 26 and a half percent of 468.

19        And similarly for women I found a total of 132

20   inside sales women as of 2005, the start of 2005, and

21   22 of them eventually made it to outside sales.  That

22   was 16.7 percent of the total.

23   Q.    Did you find that length of tenure in the entry

24   level or the feeder position had anything to do with

25   the promotion to outside sales?

1   A.    Well, strictly speaking, no, because I wasn't

2   doing a statistical analysis that factored in years of

3   service.  But the women, for what it's worth, had

4   somewhat more than a half a year of additional service

5   beyond what the men had on average.  Obviously, that's

6   just an average.  Some men had more than some women

7   and vice versa, but the average was a little higher in

8   terms of years of service for women than for men.

9   Q.    Okay.  Thank you, Dr. Killingsworth.  I ask that

10  you now look at Exhibit 43.  Dr. Killingsworth, do you

11  recognize Plaintiff's Exhibit 43?

12  A.    I have it in my book but I don't see it on the

13  screen.

14  Q.    We'll get it pulled up.

15  A.    Okay.  So I don't recognize anything on the

16  screen yet.

17  Q.    I'm sorry.  Do you recognize -- look in the book.

18  Before we can show it on the screen, we need to admit

19  it.

20  A.    Oh, I see.  I have the book.

21          THE COURT:  Well, all right.  Since this is

22  a trial to the court, go ahead and pop it up on the

23  screen.  It's not admitted yet.

24          MR. SMOLEN:  Okay.  Thank you, Your Honor.

25  Q.    *(BY MR. SMOLEN)*  Dr. Killingsworth, do you

1   recognize Plaintiff's Exhibit 43?

2   A.    I do.

3   Q.    What is Plaintiff's Exhibit 43?

4   A.    Well, that's a summary of the promotion rates

5   over the entire period, 2005 to 8.  And so there were

6   1401 distinct men, and of that number 256 were

7   promoted.  That was 18.3 percent of the total number

8   of men present over that whole period.

9        Among women, there were a total of 294, of which

10   34 women were promoted.  That was 11.6 percent of the

11   total number of women.

12        Now, for a statistician or an economist,

13   somebody like me, the interesting question is not that

14   18.3 percent of the men and 11.6 percent of the women,

15   which is seemingly a big difference, were promoted,

16   but rather you would want to ask, is that difference

17   statistically significant?  And so that's the purpose

18   of the last two columns on table 3 --

19   Q.    And I -- go ahead.  I just want to make sure we

20   clarify it for the court.

21        What you're saying is that you looked at the

22   inside sales positions in the relevant time frame, and

23   when you looked at that there were 1401 men in that

24   position; correct?

25   A.    In positions, yes.

1   Q.    Positions.  And that 256 of those men promoted to

2   outside sales from those positions?

3   A.    Correct.  At some point between 2005 and 2008.

4   Q.    And then similarly with respect to women, you

5   looked at the total number of women in the inside

6   sales positions, that being 294; correct?

7   A.    Correct.

8   Q.    And over the relevant time frame that you were

9   studying, 34 of those women were ultimately promoted

10  out?

11  A.    Right.

12  Q.    Okay.

13  A.    And so 18.3 percent of the men in inside sales

14  positions but 11.6 percent of the women in inside

15  sales positions got promoted to outside sales.

16        MR. SMOLEN:  Your Honor, I'd move to admit

17  Plaintiff's Exhibit No. 43.

18        THE COURT:  Any objection?

19        MR. MORGAN:  Yes, Your Honor.  Again, it

20  includes people other than the customer service

21  department and it doesn't show -- have any showing of

22  interest of who wanted to promote, who applied for

23  promotions, who expressed an interest through the SMD

24  process in promoting.

25        THE COURT:  All right.  The objection's

1    overruled.  Plaintiff's 43 is admitted.

2         Doctor, if you could here, because I am on that

3    level of superficial analysis that you just described

4    having studiously avoided statistics in college, and I

5    superficially understand the importance of statistical

6    significance, but can you tell me how you come to a

7    number of standard errors calculation here?

8              THE WITNESS:  Yes.

9              THE COURT:  Go ahead.

10             THE WITNESS:  Well, it's a numerator and a

11   denominator.  The numerator is the difference between

12   the rates of promotion for men and for women, and

13   that's 18.3 minus 11.6.  So that's a disparity of

14   what, 7.7 percentage points.

15        The denominator is calculated using statistical

16   theory, but the basis of the statistical theory is

17   what I like to call -- please forgive me because I'm

18   not a lawyer but I find lots of people get this,

19   especially nonlawyers -- the assumption is innocent

20   until proven guilty, or more accurately, the

21   assumption is the rates are the same until you can

22   produce strong evidence of something else.  In

23   particular, the assumption is that the process that's

24   generating these rates of promotion is sex neutral and

25   that, therefore, any disparity would be caused purely

1    by chance.

2        Under that assumption, you can calculate the

3    size of a single standard error.  That's a little bit

4    like the margin of error in an opinion poll, where,

5    you know, you hear on TV all the time some candidate

6    is ahead of somebody else or behind somebody else, but

7    that result is within the poll's margin of error.

8    Okay.  That's almost exactly the same thing as a

9    standard error.

10        Basically what they're saying is, the numbers

11    involved in the poll are either, on the one hand, so

12    small that the difference in the outcomes for the two

13    candidates could easily just be the result of chance,

14    or alternatively, the difference in support for the

15    two candidates is so big that there's no reasonable

16    way you could ascribe it to chance.

17        The threshold is usually that if a disparity --

18    I think we said it was 7.6 percent?

19            THE COURT:  I think it's 6.7.

20            THE WITNESS:  6.7 percent.  If that

21    disparity is within 1.96 standard errors in magnitude,

22    then we would say that's within the margin of error,

23    you could easily ascribe that to chance.

24        But on the other hand, if the disparity is

25    greater than 1.96, that's the conventional cut-off,

1    that would then be called statistically significant,

2    meaning unlikely to have occurred as a result of

3    chance.  In just the same way that if we say for an

4    opinion poll being discussed on TV, if the difference

5    between two candidates, or in support for this or that

6    thing, is greater than the margin of error, then in

7    that case if it's not within the margin of error, then

8    that's statistically significant and unlikely to have

9    occurred just as a fluke.

10             THE COURT:  All right.  Thank you.  Go

11   ahead.

12   Q.   *(BY MR. SMOLEN)*  The court covered this but I

13   want to make sure we have it right.

14        There's a column on the far right with the

15   heading "test of statistical significance."  What is

16   the test of statistical significance?

17   A.   Well, that's measuring the disparity in terms of

18   numbers of standard errors or standard error units.

19   And this particular disparity, 6.7 percent, in

20   promotion rates is equivalent of 2.777 standard

21   errors.  So that's well above the cut-off, the

22   conventional cut-off, for something being

23   statistically significant.

24   Q.   Okay.  Did you employ any particular methodology

25   in conducting this test of statistical significance?

1    A.    Yes.   This is a so-called Chi-squared test.

2    Other similar statistical tests would produce

3    essentially the same result.   This is quite a

4    substantial difference.

5    Q.    Is this methodology generally accepted in the

6    field of economic statistics?

7    A.    Yes.

8    Q.    What did you find after conducting your test of

9    statistical significance?

10   A.    Well, one of the things that the test of

11   significance does, and it's essentially another way of

12   describing what it means for the disparity to be equal

13   to 2.777 standard errors, is the so-called "prob

14   value" or "chance probability" it's sometimes called.

15   In this case, that's .006; that's the number on the

16   far right.

17         What that tells you is that a random process, a

18   sex-neutral process, would generate a disparity of

19   this magnitude, 6.7 percentage points in promotion

20   rates, about six times in a thousand.

21   Q.    Okay.   I'm going to have you look at paragraph 8

22   of your report, which is Exhibit 1.

23   A.    Okay.

24   Q.    And I believe that's the paragraph that

25   summarizes your findings with respect to table 3.

1    A.    Yes.

2    Q.    You indicate that the male promotion rate was

3    almost 60 percent greater than the female promotion

4    rate; is that correct?

5    A.    That's right.

6    Q.    And is that what your analysis determined?

7    A.    Yes.  Although the test of statistical

8    significance looks at the disparity in relation to the

9    size of the standard error, so that's a little bit

10   different but they're all interconnected.

11   Q.    You found a statistically significant disparity;

12   correct?

13   A.    Correct.

14   Q.    And you also found that the promotion rate of men

15   to women was 60 percent higher; correct?

16   A.    Right.  By the way, I should add, because

17   sometimes it can get confusing, a statistical

18   significance only means unlikely to have been

19   generated by a neutral process.  It doesn't mean big

20   in the ordinary language sense.

21   Q.    Okay.

22   A.    I think I would say that this difference in

23   promotions is big in the ordinary sense but it's also

24   statistically significant.  Sometimes a disparity can

25   be small but be statistically significant.  Sometimes

1    a disparity can be large but not statistically

2    significant.  So the two things aren't the same.  But

3    here, it's both large and statistically significant.

4    Q.    So how do you know that 2.777 standard errors in

5    magnitude is statistically significant?

6    A.    Well, that's a conventional cut-off which dates

7    from the early part of the last century.

8    Statisticians who studied it have used that as a

9    cut-off.  But I think the intuition is that if

10   something would occur from a neutral process less than

11   5 percent of the time -- of course, here it would

12   occur less than six times out of a thousand -- then it

13   seems quite unlikely -- well, it is unlikely that a

14   random process would generate a result like this; in

15   fact, this tells you precisely how unlikely.  And the

16   chance is very unlikely.

17   Q.    Okay.

18             THE COURT:  Let me ask you as a

19   statistician and refreshing me, not as a lawyer here,

20   the defendant argues that you don't take into account

21   the potential disparate percentages of interest in

22   promotion to account manager by males versus females.

23        How do you view that in terms of your analysis?

24             THE WITNESS:  Well, this particular

25   analysis, I would say, sets the stage, and, in fact,

1   it's quite similar to the analysis that Dr. Steward

2   did.  But this particular analysis doesn't take

3   account of anything other than just sex.  So in that

4   sense, there's more to be done, and that's in fact why

5   I do more.  I'd argue that the later analyses simply

6   reinforced the message here.

7            But I often find that when people ask about

8   statistical results, you don't trot out a Cox

9   proportional hazard regression first thing, you shove

10  something much more straightforward.  And I think

11  that's good because it helps focus ideas and say,

12  well, you know, what if you took account of this,

13  that, and the other.  So that's coming, believe me.

14            THE COURT:  Mr. Smolen.

15            MR. SMOLEN:  Thank you, Your Honor.

16  Q.    *(BY MR. SMOLEN)*  So essentially, if you would,

17  Dr. Killingsworth, give us your opinions after -- just

18  your initial opinions after the review of the SAP data

19  between 2005 and 2008.

20  A.    This is table 3 you mean?

21  Q.    Yes.

22  A.    Oh.

23  Q.    It's in paragraph 9 of your report if you --

24  A.    Oh, I'm sorry.  Oh, well, it says the disparity

25  was large.  In the ordinary language sense, it is

1    statistically significant and adverse to women.  They

2    had a substantially lower rate of promotion from

3    inside sales into outside sales, no question.

4    Q.    And just generally, did you do this same analysis

5    but limit it to October 18th, 2007, through December

6    31st of 2008?

7    A.    Yes.

8    Q.    Okay.  And what did you -- why did you do that;

9    do you recall?

10   A.    Well, I think you asked me.  I think there was

11   some question about the relevant period for legal

12   purposes.

13   Q.    Okay.  And look, if you would, at your

14   supplemental report, paragraphs 26 -- give me one

15   second, Dr. Killingsworth.

16                  *(Discussion held off the record)*

17   Q.    *(BY MR. SMOLEN)*  Dr. Killingsworth, let's look at

18   Plaintiff's Exhibit 57.  Are you there,

19   Dr. Killingsworth?

20   A.    I am.

21   Q.    Do you recognize Plaintiff's Exhibit 57?

22   A.    I do.

23   Q.    What is Plaintiff's Exhibit 57?

24   A.    Well, that is for just the period October 18th,

25   2007, to the end of 2008, what I did in the previous

1    exhibit for all of 2005 to 8.

2    Q.   So essentially you limited the time frame to a

3    time frame in which the defendant had indicated they

4    believed the relevant time frame to be?

5    A.   Well, I don't know what they said or didn't.  But

6    at any rate, this limits it to that time frame.

7    Q.   Okay.  And so limiting the promotion data to

8    October 18th, 2007, through December 31st, 2008, what

9    did you find?

10   A.   Well, again, the difference of the promotion rate

11   for women -- or sorry -- the promotion rate for men is

12   almost three times bigger, two and a half, two and

13   three quarters times bigger.  6.2 is quite a lot

14   larger than 2.6 percent.  That's the equivalent of

15   2.324 standard errors, again well above the

16   conventional threshold of 1.96.  And this would happen

17   in a neutral process about two times out of a hundred,

18   two percent of the time.

19   Q.   Okay.

20            MR. SMOLEN:  Your Honor, I'd move to admit

21   Exhibit 57.

22            THE COURT:  Any objection?

23            MR. MORGAN:  Same objections as before,

24   Your Honor, as to the definition of inside sales and

25   lack of any bringing it home as to who wanted the job.

1           THE COURT:  Understand.  The objection's
2   overruled.  Plaintiff's 57 is admitted.
3   Q.   *(BY MR. SMOLEN)*  Dr. Killingsworth, are you
4   familiar with the term Cox semiparametric regression
5   analysis?
6   A.   Yes.
7   Q.   What is Cox semiparametric regression analysis?
8   A.   It's a form of regression analysis, and
9   regression analysis is a statistical technique for
10  considering how an outcome might be related to a
11  number of factors.
12  Q.   Is Cox semiparametric regression analysis a
13  widely accepted methodology in the field of economic
14  statistics?
15  A.   Yes.
16  Q.   Did you conduct any such regression analysis as
17  part of your work in the case?
18  A.   I did.
19  Q.   Prior to this case, had you ever conducted a Cox
20  semiparametric regression analysis in a similar
21  manner?
22  A.   Yes.  I've done the same sort of analysis on a
23  number of occasions in cases like this one.  I think I
24  mentioned the publication in the Journal of Labor
25  Economics about the family cap experiment in New

1    Jersey; again, the same thing.

2    Q.    Did you consider any particular factors or

3    variables in conducting your regression analysis in

4    this case?

5    A.    Yes.

6    Q.    What factors or variables did you consider?

7    A.    If we can go to the exhibit, that would help.

8    Q.    Let's look at Plaintiff's Exhibit 44.

9    A.    Okay.  Well, I considered what economists call

10   models, several different models.  Basically, that's

11   just a shorthand name for several different sets of

12   variables that may be related to the result.

13        In the family cap case, the deep-ended variable,

14   the outcome I was looking at, was do you have a child.

15   There were various factors that might affect that, the

16   age of the mother as of the start of the experiment

17   and how many children she already had and whether she

18   was subject to the cap on benefits, etcetera,

19   etcetera.

20        Here, the deep-ended variable or outcome is, do

21   you get promoted to outside sales.  The people being

22   considered here were all inside sales as of the time

23   of the data being measured.

24        The first model just had an indicator for female

25   sex.  So this is a fancier version of the sort of

1   things that we saw before because those tables look

2   just at sex.  That's model one.  So there's one

3   independent variable that is being considered as

4   something that might be related to the outcome of

5   promotion.

6          Model 2 takes account not only of female sex,

7   but also age and indicators for area at Hilti,

8   customer service or the others.

9          Model 3 includes an indicator for minority as

10  well as the indicators that are in model 2, the

11  variables.

12         And finally No. 4, the model 4, has more

13  variables that are being considered as potentially

14  related to the outcome of promotion to outside sales;

15  namely, female sex, age, area at Hilti, whether you're

16  a minority, what were your years of service as or

17  January 1, 2005, if you were an incumbent, or what

18  year were you hired if you were hired during or after

19  2005.  So there, model 4 obviously is the one with the

20  most factors, but it's built up from models 1, 2, and

21  3.

22  Q.   How did you choose the variables?

23  A.   Well, they were -- a crucial consideration was

24  they were available in the data.  You can't include

25  something if it's not in the data.

1    Q.    And did you have all of these variables in the
2    data that you looked at?
3    A.    Yes.  With a couple of little tiny technical
4    asterisks.
5          We saw, for instance, in the SAP data that they
6    provide an indicator for date of birth.  So I
7    calculated age as of either January 1st, 2005, or as
8    of the date of hire as the case may be.  And
9    similarly, year of hire or years of seniority, they
10   had -- the data had date of entry so I just used that
11   to compute year of hire --
12   Q.    Okay.
13   A.    -- or years of seniority.
14   Q.    And explain to the court, if you would, how were
15   these variables incorporated into the regression
16   analysis?
17   A.    Well, they are treated as so-called independent
18   variables, factors that may be related to the outcome.
19   And in this case, of course, the outcome is, do you
20   get promoted?
21         I think my report has a graph because I find
22   that using sort of a simple graph -- graphical
23   example, a picture here is worth a thousand words.  I
24   think it's an appendix to this first report.
25   Q.    I believe it's the next exhibit.

1    A.    Oh, okay.

2    Q.    Before we get there, what were your results of

3    your regression analysis?

4    A.    Well, the results are in the next table, I think,

5    table 5 --

6    Q.    Let's look at that.

7    A.    -- Exhibit 45.

8    Q.    Exhibit 45?

9          MR. SMOLEN:  Your Honor, I can't remember

10    if we moved to admit Exhibit 44 or not; but if we

11    haven't, I move to admit that.

12          THE COURT:  Any objection?

13          MR. MORGAN:  Yes, Your Honor.  I don't

14    think it bears on this case at all because it omits

15    the numerous things that should have been considered

16    such as mobility.  I think we're spinning our wheels

17    here because he is not analyzing anything that's

18    relevant to this case.

19          THE COURT:  And response?

20          MR. SMOLEN:  My response.  Your Honor, my

21    response is Dr. Killingsworth took all the data and he

22    was looking at any potential variable that could

23    affect the outcome of the promotion rate.  Maybe this

24    was a result of race, maybe it was a result of age,

25    maybe it was a result of area in the company, maybe it

1    was a result of tenure.  He ruled all those out and

2    that's essentially what we're doing here.  That's what

3    he's required to do.

4         And I'm going to get to the M rating and the P

5    rating.  That's the last step in the rebuttal.  We're

6    going to get there.

7             THE COURT:  Well, once again, I think

8    that's a bit of an overstatement, any potential

9    variable.  He's already said these variables were

10   selected because they were available variables.

11            MR. SMOLEN:  Right.

12            THE COURT:  The question remains as to

13   whether or not some of these variables may stand as

14   suitable substitutes for things like desire to be

15   promoted, such as age, which may take into

16   consideration certain other factors.

17        With those considerations in mind, Plaintiff's

18   44 is admitted.  Go ahead.

19   Q.   *(BY MR. SMOLEN)* Dr. Killingsworth, would you

20   please look at Plaintiff's Exhibit 45?

21   A.   Yes.

22            MR. SMOLEN:  One second, Your Honor.  I'm

23   just trying to --

24            THE COURT:  Yes, sir.

25   Q.   *(BY MR. SMOLEN)* Dr. Killingsworth, you had

1   mentioned a graph.  Would you look at Plaintiff's

2   Exhibit 48?

3   A.    Yes.

4   Q.    Is this the graph that you were referring to?

5   A.    Yes.

6   Q.    Okay.  And explain to us what the graph shows

7   again.

8   A.    Okay.  Well, I want to emphasize this is made-up

9   data, hypothetical data, purely for purposes of

10  illustration.  So this is not about Hilti, it's not

11  about any company.  It's just me doing what I would do

12  in the classroom using -- using hypothetical data just

13  to clarify the concept involved because I think that's

14  what's crucial here.

15       So the triangles refer to men and the squares

16  refer to women.  The triangles are a little darker.

17  When I did this in color, they were blue for boys, and

18  the squares that are a little lighter in color are

19  pink for girls on this figure 1.

20       This may seem like a little bit like what you

21  see on Sunday morning after a hard party Friday

22  night -- or Saturday night, but when you look at it

23  more carefully you see a pattern.  The pattern is that

24  the triangles for men generally lie above the squares

25  for women and then you notice that the vertical axis

1   is labeled percent promoted.  This is being plotted

2   against just one factor; namely, years of service, and

3   so you get basically two things from this in a very

4   loose nonquantitative way.

5        The first thing that you see is that in some

6   general average sense, the longer you've been with the

7   company, the higher the promotion rate.  People who

8   have just signed on or who have very little experience

9   at the company have lower promotion rates in general.

10  There are obvious exceptions.  This is not a rigid,

11  one-for-one sort of relationship, but the nature of

12  the relationship is clearly positive, upward sloping,

13  we would say.

14       And the other thing is that most of the male

15  triangles lie above most of the female squares.  So

16  that suggests -- and, again, I want to emphasize this

17  is hypothetical data, just purely for illustration,

18  nobody should draw any conclusions about anything,

19  least of all Hilti, from this, just for illustration

20  sake -- the relationship is also that on average, at

21  any given level of years of service, men are more

22  likely to be promoted than women.

23  Q.   Okay.  Let's look at Plaintiff's Exhibit 45.

24  A.   Actually would it be possible -- there's one more

25  graph, I think, which is --

1   Q.   We can look at, yeah, 49 if you'd like,

2   Dr. Killingsworth.

3   A.   Yeah.  Because I think that makes it much clearer

4   what's going on in a regression.

5         MR. SMOLEN:  Your Honor, we'd move to admit

6   Plaintiff's Exhibit 48.

7         MR. MORGAN:  Objection, Your Honor.  He

8   said that was completely made-up data.

9         THE COURT:  The objection is sustained.

10  And I do understand to some extent regression

11  analysis.  So --

12        MR. SMOLEN:  Okay.

13        THE COURT:  -- we'll not admit these

14  hypothetical figures.  Let's go ahead and move on to

15  45.

16  Q.   (BY MR. SMOLEN)  Okay.  Dr. Killingsworth, do you

17  recognize Plaintiff's Exhibit 45?

18  A.   Yes.

19  Q.   On the left side, there's a column with the

20  heading "model."  Do you see that?

21  A.   Yes.

22  Q.   What does the model column represent?

23  A.   Well, that's just a shorthand way of referring to

24  the variables that are included in each of the models

25  that were described, I think, in the previous exhibit,

1    Exhibit 44.

2         So model 1, for instance, was the

3    regression that just included a variable for female

4    sex.  And model 2 was the regression that included

5    variables for female sex, age, and area at Hilti and

6    so forth.

7    Q.   Okay.  To the right, there's a column with the

8    heading "coefficient for female-male promotion

9    difference."  Do you see that?

10   A.   Yes.

11   Q.   What is the coefficient for female-male promotion

12   difference?

13   A.   Well, that's a measure of the difference in rates

14   of promotion for men and women.  And roughly speaking,

15   it's in percentage terms.  It's a little bit more

16   complicated than that, but that's the simplest way I

17   can describe it.

18        Another way to think of it is to say that's the

19   measure of extent, if any, to which the cloud of

20   actual data points for women lies below the cloud of

21   actually data points for men in terms of that figure

22   we were just discussing.  And they're all negative,

23   which tells you that, in fact, the female rates of

24   promotion, holding constant all of the variables that

25   are included in each regression model, is below that

1    of men.

2    Q.    Okay.

3    A.    That's the number on top.  There are sort of two

4    sets of numbers, one has a minus sign in front of it

5    and the other's in parentheses.

6         So let me take model 4 because I think that's

7    the one that has the most explanatory variables.  So

8    what that says is, first of all, the coefficient on

9    top minus 0.556 tells us that female rates of

10   promotion are substantially less, in the ordinary

11   sense of the word, about 50 percent less, than those

12   of male candidates who are the same in terms of all

13   the variables that are included in model 4.

14             MR. MORGAN:  Objection, Your Honor.

15   A.    So that's, therefore, very different.

16             THE COURT:  I'm sorry.  Yes.  Go ahead.

17             MR. MORGAN:  Move to strike the answer.  He

18   said "male candidates."  This does not purport to

19   relate to candidates for promotion, this is general

20   population.  It doesn't have anything to do with

21   candidates.  I move to strike his answer.

22             THE COURT:  All right.  Obviously he'll be

23   subject to cross-examination.  The objection's

24   overruled.  Go ahead.

25             MR. SMOLEN:  Thank you, Your Honor.

1  Q.    *(BY MR. SMOLEN)* Dr. Killingsworth, did you

2  arrive at any opinions as a result of these regression

3  analyses?

4  A.    Yes.  Well, the other thing that appears in

5  parentheses in each of the four cases, that's again a

6  measure of the number of standard errors.

7  Q.    Okay.

8  A.    And the number of standard errors is always well

9  above 1.96.  So I think I summarized it in the report,

10  but I'd summarize it just right now by saying that

11  women are substantially, in the ordinary language

12  sense, and also statistically significantly less

13  likely to be promoted than are men who are the same in

14  terms of the factors that are considered in each of

15  these models.  And in the case of model 4, for

16  example, that means factors such as area at Hilti,

17  years of service at Hilti, age, and so forth.

18  Q.    And did you do this same analysis for the time

19  frame of October 18th of --

20          MR. SMOLEN:  I need to move to admit 45,

21  Your Honor.

22          THE COURT:  Any objection?

23          MR. MORGAN:  Same objections as usual, Your

24  Honor.  Not related to customer service, doesn't

25  attempt to analyze who's interested in the job, it

1    doesn't attempt to analyze mobility factors, or any of

2    the other factors that should have been analyzed.

3              THE COURT:  The objection's overruled.

4    Plaintiff's 45 is admitted.  Go ahead.

5              MR. SMOLEN:  Thank you, Your Honor.

6    Q.   *(BY MR. SMOLEN)*  Dr. Killingsworth, just looking

7    real quick at Plaintiff's Exhibit 58 --

8    A.   Yes.

9    Q.   -- do you recognize that document?

10   A.   I do.

11   Q.   Okay.  And is this essentially the same as 45,

12   just limited to the time frame of October 18, 2007,

13   through December 31st of 2008?

14   A.   Yes.

15   Q.   Okay.  And what did you find there?

16   A.   Well, essentially the same as the results in the

17   previous exhibit that was 45.  Again, there are quite

18   substantial differences in rates of promotion, they

19   are adverse to women, they are sizable in the ordinary

20   sense.  With the exception of model 3, which is close

21   but not quite at the threshold for statistical

22   significance, the other three, including the one with

23   all the variables, model 4, all of the results, except

24   No. 3, are statistically significant at conventional

25   test levels at the 1.96 threshold for numbers of

1    standard errors.

2    Q.    Okay.

3            MR. SMOLEN:  Your Honor, we'd move to admit

4    Plaintiff's Exhibit 58.

5            MR. MORGAN:  Same objections, Your Honor.

6            THE COURT:  The objection's overruled.

7    Plaintiff's 58 is admitted.

8            MR. SMOLEN:  Thank you, Your Honor.

9    Q.    *(BY MR. SMOLEN)*  Now, if you would, I'd like you

10   to look at Plaintiff's Exhibit 46.

11           MR. SMOLEN:  Your Honor, can I approach

12   real quick just to ask a question just to speed it up?

13           THE COURT:  Yes, sir.  If you could

14   approach one of the microphones here because this is a

15   big courtroom and unfortunately you have to stick

16   relatively close to the mic.  Go ahead.

17           MR. SMOLEN:  We had Dr. Killingsworth run a

18   regression analysis excluding the pro shop sales

19   positions, and that's what this part of the report is

20   about.  As long as the court's made a finding that the

21   pro shop sales consultant was, in fact, a feeder

22   position --

23           THE COURT:  Oh, I have not made any sort of

24   finding in that regard at all.  That's what this is

25   all about, for you to --

1          MR. SMOLEN:  Okay.

2          THE COURT:  I'm just trying to understand

3    what the --

4          MR. SMOLEN:  We'll go through it.

5          THE COURT:  -- feeder group is.  There's

6    been no finding.

7          MR. SMOLEN:  Okay.

8          THE COURT:  That has yet to come.

9          MR. SMOLEN:  Sure.  Okay.

10   Q.    *(BY MR. SMOLEN)* Let's look at Exhibit 46 then,

11   Dr. Killingsworth.  Do you recognize Exhibit 46?

12   A.    I do.

13   Q.    Okay.  What is Exhibit 46?

14   A.    Well, 46 is analogous really in every way, except

15   one, to the analysis in Exhibit 43.  It does just the

16   same thing.  The only difference is that from this

17   analysis, the one in Exhibit 46, Hilti pro shop

18   personnel are omitted.

19   Q.    Okay.  So this analysis just includes Hilti

20   center reps and customer service reps; is that

21   correct?

22   A.    That's right.  I think that's right, yes.

23   Q.    Okay.

24   A.    Anyway, the remaining inside salespeople who are

25   left after you delete the pro shop people.

1  Q.    Okay.  And what did you find when you did that

2  analysis?

3  A.    Well, the disparity in promotion rates for men is

4  roughly double that of women, 23.4 versus 11.4.

5  That's certainly statistically significant.  The

6  number of standard errors is 3.6.  That would occur by

7  chance -- a disparity, at least as large as that,

8  would occur by chance about three times in -- I think

9  it's ten thousand.

10 Q.    Okay.  And you've found that obviously to be

11 statistically significant; correct?

12 A.    Statistically significant.  And I would say also

13 large in the ordinary sense.

14 Q.    Okay.

15         MR. SMOLEN:  Your Honor, I'd move to admit

16 Plaintiff's Exhibit 46.

17         MR. MORGAN:  Same objections, Your Honor.

18         THE COURT:  Plaintiff's 46 is admitted.

19 Q.    *(BY MR. SMOLEN)* Let's look at Plaintiff's

20 Exhibit 47.  Do you recognize Plaintiff's Exhibit

21 47?

22 A.    I do.

23 Q.    And what is Plaintiff's Exhibit 47?

24 A.    Well, that's another analysis, a Cox

25 semiparametric regression analyses, or set of them,

1    with pro shop personnel omitted.  Otherwise, it's

2    exactly the same, the models are the same, the people

3    with that one exception are the same, and so forth.

4    Q.    When you say "the same," the same as Exhibit

5    45?

6    A.    Yeah, that's right.  It's like Exhibit 45 but

7    with the pro shop people removed.

8    Q.    Okay.  And what were the results of the

9    regression analysis after omitting the pro shop

10   personnel?

11   A.    Well, basically the same as before.  Omitting the

12   pro shop personnel, what you get in Exhibit 47, does

13   not change very much really at all the substantive

14   results in Exhibit 45.  All of the coefficients are

15   negative, meaning the promotion rate difference is

16   adverse to women.  They're all sizable in the ordinary

17   language sense.  And they're all clearly statistically

18   significant and well above the 1.96 standard error

19   threshold.

20           MR. SMOLEN:  Your Honor, we'd move to admit

21   Plaintiff's Exhibit 47.

22           MR. MORGAN:  Same objections, Your Honor.

23           THE COURT:  Plaintiff's 47 is admitted.

24   Q.    *(BY MR. SMOLEN)* Dr. Killingsworth, did you

25   prepare an expert report in this matter?

1    A.    I did.

2    Q.    Did you also prepare a rebuttal expert report in

3    this matter?

4    A.    I did.

5    Q.    What was the purpose of your rebuttal report?

6    A.    Well, I think first and foremost, to respond to

7    the expert for the defendants, Dr. Steward.

8    Q.    Did you understand that Hilti had a global

9    develop and coach process?

10   A.    Yes.

11   Q.    And what was your understanding of that process?

12   A.    I'm going to get the acronyms mixed up, I'm

13   afraid, or the alphabet soup.  That included

14   basically -- well, I think it's -- it included

15   coaching, it included feedback, and it included

16   evaluations.  People would seek to be part of the

17   process, and their behavior, their understanding of

18   the business, their selling, various other things

19   would be evaluated.

20   Q.    Okay.  I'm going to have you look at what's

21   previously been admitted into the record as

22   Plaintiff's Exhibit 20.  You'll find it in the book.

23   A.    Oh, yes.

24   Q.    Is this what you understood -- we're looking at

25   your analysis -- what you understood the GDCP process

1   to be?

2   A.    Yes.  In fact, that's what I read.

3   Q.    Okay.  Are you familiar with what Hilti refers to

4   as "applicant flow data"?

5   A.    Yes.

6   Q.    What is Hilti's applicant flow data?

7   A.    It records some -- I use that word

8   advisedly -- it records some people who expressed an

9   interest in -- well, at least the applicant flow data

10  I looked at records the interest of some people in

11  obtaining an outside sales position.

12  Q.    And for what years did you look at applicant flow

13  data?

14  A.    2008 -- sorry -- 2005 through 8.

15  Q.    And did you conduct an analysis of this applicant

16  flow data?

17  A.    It would be a little too pretentious to call it

18  an analysis.  I looked very carefully, but I didn't do

19  a statistical analysis in the sense of the kinds of

20  analyses I was doing before.

21  Q.    What did you -- what were you looking at when you

22  looked at the applicant flow data?

23  A.    Well, in the first instance, I just wanted to

24  find out what was there and what wasn't, who was in

25  and who wasn't, and what did the data tell me about

1    people who were seeking positions, what happened to

2    them, that sort of thing.

3    Q.    And what did that tell you?

4    A.    Well, first, it told me about some number of

5    people who sought positions, both from outside Hilti

6    and within Hilti.  By "positions," I mean outside

7    sales positions.

8          I also felt the longer I looked at these data

9    that there were very large numbers of people who I

10   knew had gotten promotions -- I knew that from the SAP

11   data -- but they didn't appear at all in the applicant

12   flow data which surprised me a little.

13         And I also noticed that the data -- the

14   applicant flow data were not well kept in the sense

15   that there were lots of gaps, the same event was

16   characterized differently and inconsistently from one

17   person to another, the same sort of status was

18   sometimes characterized in a way that didn't resemble

19   the way the same event was characterized for someone

20   else, that kind of thing.

21   Q.    Okay.  Did you also look at the SMD data?

22   A.    Yes.

23   Q.    And what did you understand the SMD data to be?

24   A.    The -- I think that's shorthand for either --

25   I've heard it both ways -- sales management

1    development or sales management data.  I think

2    Dr. Steward calls it sales management data.  And

3    it's -- in fact, there's some discussion of this in --

4    I guess it's Exhibit 20.

5         The two key things that I took away from that

6    were that in some instances -- not a lot -- but in

7    some instances there is an evaluation of somebody's

8    promotability and also a measure of somebody's

9    mobility and you get a rating from, I think, one to

10   five, one is the best, five is the worst.

11   Q.   Okay.  And the SMD data that you recorded

12   was -- if you need to look at your report to refresh

13   your memory, let me know -- but the CS department SMD

14   data for 2006?  Do you recall looking at that?

15   A.   Yes.

16   Q.   The CS department SMD data for 2007?

17   A.   Yes.

18   Q.   I'm sorry.  12 of '07.  The CS department SMD

19   data for 3 of '07?

20   A.   Yes.  There were a series of files and they were

21   all SMD data --

22   Q.   Okay.  Customer --

23   A.   -- for different dates and different years.

24   Q.   Customer service department SMD data?

25   A.   Yes.

1    Q.    And then as well, the base 2008 SMD completion?

2    A.    That sounds familiar, yes.

3    Q.    If you would look at now Plaintiff's Exhibit 50.

4    If you would, please tell the court what is depicted

5    in Plaintiff's Exhibit 50.

6    A.    Okay.  Well, this is asking about the

7    availability of data or the lack of availability of

8    data, and this looks at whether people who are

9    promoted from inside to outside sales had data in the

10   applicant flow data and information on their

11   promotability, a P code, and information on their

12   mobility, the M code.

13              MR. SMOLEN:  Your Honor, I'd ask that we

14   move to admit Plaintiff's Exhibit 50.

15              THE COURT:  Any objection?

16              MR. MORGAN:  Yes, Your Honor.  There's been

17   no foundation for this, that he actually looked at the

18   promotability codes as they applied to the dates of

19   promotion, because as we know, a P5 can change into a

20   P1.  So if he's looking at a promotion that comes

21   about in June when a person was a P5 in November, then

22   there's no -- there's no correlation there.  He hasn't

23   done the detailed work to make this analysis, and, in

24   fact, the documents he looked at don't support this

25   analysis whatsoever.

1            THE COURT:  I'm going to reserve a ruling

2     on its admissibility.  We need a bit more foundation.

3     And frankly, I'm going to allow Mr. Morgan to voir

4     dire the witness with regard to this particular

5     exhibit before deciding its admissibility.

6            You can inquire, Mr. Smolen, with regard to

7     laying a foundation here.

8            MR. SMOLEN:  I'm sorry.  You were going to

9     have Mr. Morgan voir dire him now?

10            THE COURT:  Well, he may if you have no

11     additional questions of the witness with regard to

12     this particular exhibit.

13            MR. SMOLEN:  I could ask some more

14     foundational questions, if you'd like.

15            THE COURT:  Please.

16     Q.    *(BY MR. SMOLEN)*  Dr. Killingsworth, when you were

17     looking at the applicant flow data, you looked at what

18     the company had produced as far as applicant flow

19     data; correct?

20     A.    Yes.

21     Q.    Okay.  And you looked at the promotability codes

22     and the mobility codes that were contained in the

23     entire SMD data that was provided to you; correct?

24     A.    Yes.

25     Q.    Okay.  And you found that persons with missing

1     data, that there were 215 of those people in that SMD

2     data that did not have a P code assigned to them;

3     correct?

4     A.    That's right.  This is not about whether you had

5     a P1 or a P5 or something else.  This is concerned

6     solely with whether you had any P value.

7     Q.    Right.

8     A.    And similarly for the M value.

9     Q.    You knew they had been entered into the SMD data

10    because you were looking at the SMD files; correct?

11    A.    Right.

12    Q.    And all you were doing here was making a

13    determination of those who had been entered into the

14    SMD data, that 215 of them did not have P codes?

15    A.    Right.  So this is talking about blanks, not

16    values.

17    Q.    Right.  It simply wasn't there?

18    A.    No codes rather than codes of P1 or M3 or

19    anything else.

20    Q.    And with respect to mobility codes, you looked in

21    the SMD data and you determined that there were 179

22    individuals in the SMD data who had not had an M code

23    assigned to them?

24    A.    There were a lot of missing M codes, that's

25    right.

1   Q.    Okay.  And then you just did a simple percentages

2   of that amount and you said 76 percent and 63 percent

3   roughly; correct?

4   A.    That's right.

5           MR. SMOLEN:  Your Honor, I'd move to admit

6   it.  We're not talking at this point P3 to P5.  We're

7   talking about whether they had the data there or

8   not.

9           THE COURT:  All right.  I appreciate you

10  clarifying that.  I'm going to give Mr. Morgan an

11  opportunity to voir dire with respect to this

12  particular document.  Go ahead, sir.

13                  **VOIR DIRE EXAMINATION**

14  **BY MR. MORGAN:**

15  Q.    Dr. Killingsworth, from whom did you gain an

16  understanding of what the SMD documents were?

17  A.    Do you mean the files, the computer files?

18  Q.    Yeah, the files.

19  A.    Oh, well, I looked at them first and foremost;

20  and secondly, I looked at the document we saw just a

21  moment ago about the -- what is it? -- GCD --

22  Q.    Doctor, you didn't list that as one of the

23  documents you looked at.  How can you say you looked

24  at it now?  You didn't list that as one of the

25  documents you reviewed in coming up with your

1    analysis.

2    A.    Well, I had it.  If I failed to list it, it was

3    an oversight.  I think -- I don't remember seeing a

4    Bates number.  Maybe that's why it was a mistake on my

5    part in that case.

6    Q.    When you put together your report, are you

7    careful?

8    A.    I try to be, of course.

9    Q.    And do you list the material that you rely upon

10   in coming up with your opinions?

11   A.    Yes.

12   Q.    Okay.  So the first time around, your first

13   opinion, which is Plaintiff's Exhibit 1, you listed

14   two documents that you looked at?

15           THE COURT:  Now we're getting a little far

16   afield.  I want to focus on this particular document.

17   You're going to have an opportunity to

18   cross-examine.

19           MR. MORGAN:  Yes, sir.  Okay.

20           THE COURT:  Your objection was that this

21   document was based upon either incomplete or improper

22   documentation.  We need to focus on this document.

23           MR. MORGAN:  Yes, Your Honor.

24   Q.    *(BY MR. MORGAN)*  In terms of looking at the SMD

25   sheets, you saw that they were as of a certain date;

1    correct?

2    A.    Yes.

3    Q.    There's one for 4/17/2006.  Did you take the

4    dates that those documents were created into account

5    in doing your analysis to put together the Exhibit 50

6    that we were looking at?

7    A.    No.  Because I didn't need to.

8    Q.    So you just looked at all the documents, and

9    regardless of when the promotion occurred, you then

10   made a decision?

11   A.    Well, I didn't make a decision.  I just asked, do

12   I find an M code for this person ever?  Do I find a P

13   code for this person ever?  If the answer was no,

14   then -- then the answer is there's not a P code or an

15   M code for them.  So I didn't need to localize it by

16   date, if that's what you're asking.

17   Q.    That's what I'm asking.

18   A.    Not for purposes of this.

19   Q.    Okay.  Is there any requirement that a company

20   keep SMD records on a periodic basis?

21   A.    Well, I'm not aware of any such requirement.

22   Q.    All right.

23   A.    But from the point of view somebody analyzing the

24   data --

25   Q.    No, sir.  You answered my question.  Thank you,

1    Doctor.

2         Now, so a person who might not appear on a

3    spreadsheet could still be qualified, could still have

4    an interest, and could still get into the running;

5    correct?

6              MR. SMOLEN:  Your Honor, I'm going to

7    object.  This doesn't seem to be proper voir dire for

8    these documents that we're talking about.

9              THE COURT:  I understand.  We're really

10   looking here at the statistical analysis.  I

11   understand your bigger, broader overview here in your

12   objections, but what we're trying to determine is --

13   forgive me; you all have lived with this case far

14   longer than I -- but we're trying to determine whether

15   or not there is data by which this witness can

16   determine the promotability and mobility of these

17   people who are actually promoted from inside to

18   outside sales in terms of an available database.

19             MR. MORGAN:  We're just talking about in

20   the database but with the understanding that that is

21   not the be all and end all.  If he's just looking at a

22   document at a given time and coming up with a number

23   that data may or may not be present, then I think

24   that's what he's done.

25   Q.   *(BY MR. MORGAN)*  Is that right, Doctor?

1    A.    Well, not really.  I was looking at whether data

2    are or are not present, not whether they may or may

3    not be present.  And I quite agree, there may be all

4    kinds of data floating out there or notes scribbled

5    down or anything else that I didn't have, but what I

6    found was a lot of blanks.

7    Q.    Okay.  And do you know if the blanks -- do you

8    think the blanks meant that they didn't complete them

9    or that there was no need to complete them?  You don't

10   know?

11   A.    That would be speculation on my part.

12   Q.    Okay.  So you don't know one way or the other

13   whether they were blank for a purpose or not?

14   A.    All I know is that there were lots and lots of

15   blanks.

16   Q.    Okay.

17            MR. MORGAN:  No further questions, Your

18   Honor.

19            THE COURT:  Very well.  The objection's

20   overruled.  Plaintiff's Exhibit 50 is admitted.  Go

21   ahead, sir.

22            MR. SMOLEN:  Your Honor, I'm going to spend

23   some time on the next section.  It's 11:45.  I didn't

24   know if you wanted to break now or if you'd rather me

25   continue until you're ready to take a break.

1          THE COURT:  If this is a good place to

2    break, we'll do so at this time.  It's 11:50.  We'll

3    reconvene here at 1:15.

4          MR. SMOLEN:  Thank you, Your Honor.

5              *(Lunch recess was taken)*

6          THE COURT:  Mr. Smolen.

7          MR. SMOLEN:  Thank you, Your Honor.  Your

8    Honor, I couldn't remember if we actually had admitted

9    Plaintiff's Exhibit 50 before we stopped.

10         THE COURT:  I show that we did.

11         MR. SMOLEN:  Okay.  Thank you.

12         THE COURT:  Mr. Overton.

13         DEPUTY COURT CLERK:  I have 50 admitted,

14   yes.

15   Q.   *(BY MR. SMOLEN)* Dr. Killingsworth, we've talked

16   about applicant flow and we've talked about SMD data.

17   Are you familiar with what the P code is or what you

18   understood it to be?

19   A.    Yes.

20   Q.    Okay.  And what did you understand the P code to

21   be?

22   A.    Well, it's supposed to be a measure of

23   promotability.

24   Q.    Okay.

25   A.    And 1 is the most promotable and 5 is the

1    least.

2    Q.    And did you conduct an analysis based around the

3    P code?

4    A.    Well, I compiled statistics on the presence of

5    the P code.

6    Q.    Okay.  And why --

7    A.    I wouldn't call that a statistical analysis.

8    Q.    Why did you do that?

9    A.    Because from having looked at the data, just

10   eyeballing it, it seemed pretty clear that there were

11   a lot of empty buckets missing.  So I then set out to

12   try and be a little bit more systematic in detailing

13   that.

14            MR. SMOLEN:  One second, Your Honor.

15            THE COURT:  Yes, sir.

16            MR. SMOLEN:  May I approach, Your Honor?

17            THE COURT:  Yes, sir.

18            *(Discussion held off the record)*

19   Q.    *(BY MR. SMOLEN)*  Dr. Killingsworth, I've asked

20   you to take a look at paragraph 5 of your supplemental

21   report.

22            THE COURT:  Is this an exhibit?

23            MR. SMOLEN:  No, it's not, Your Honor.  I'm

24   using it to refresh his memory as to why he looked at

25   the P code ratings.

1          MR. MORGAN:  Your Honor, I don't think he's

2     exhausted his memory at this point to refresh it at

3     this point.

4          MR. SMOLEN:  I can ask him --

5          THE COURT:  That's right.  Sustained.  Go

6     ahead.

7     Q.   *(BY MR. SMOLEN)*  Dr. Killingsworth, do you recall

8     Dr. Steward opining that you did not take into

9     consideration those factors which would relate to a

10    person's promotability?

11    A.   Yes.

12    Q.   Okay.  And did you prepare a report in response

13    to that?

14    A.   Yes.

15    Q.   Okay.  And would looking at that report help you

16    refresh your memory as to what you found with respect

17    to the P code findings?

18    A.   Yes.  Among other things.

19    Q.   Okay.

20    A.   There were other things in the report but --

21    Q.   Okay.  Let's focus just on that now, if you

22    would, please.

23         On paragraph 5 -- in reviewing paragraph 5, does

24    that refresh your memory as to why you did a study on

25    the P code?

1   A.    Yes.  Well, it provided some documentation of my

2   sort of general impression that the P code was missing

3   in a lot of cases.

4   Q.    Okay.  If you would, what does paragraph 5

5   indicate in your report that Steward had opined with

6   respect to equally qualified employees?

7   A.    Well, he said, I think, that applicants for

8   promotion are not all equally qualified, and the P

9   code was apparently supposed to be intended as a

10   measure of promotability and, I guess, qualifications

11   for promotion.

12   Q.    And is that why you then went back and looked at

13   the SMD data as it pertained to P codes?

14   A.    Right.  Well, I just wanted to see how

15   widespread -- sorry -- to what extent was it available

16   at all.

17   Q.    Okay.  And based on your review of Steward's

18   report, did he actually do an analysis or regression

19   analysis where he took into consideration the P code?

20   A.    No.  I'm not aware of any study that he did --

21   Q.    Okay.

22   A.    -- that took into account the P code in any way.

23   Q.    Okay.  And the same thing with respect to the

24   mobility code:  Did you also look at the mobility

25   code?

1   A.   I did.

2   Q.   Okay.  And did you do that for the same reason

3   that Dr. Steward had opined, that mobility had

4   something to do with promotions?

5   A.   Yes.

6   Q.   Okay.  And do you recall what Dr. Steward opined

7   about the M codes?

8   A.   Well, that mobility was potentially important --

9   Q.   Okay.  And did you --

10  A.   -- for promotion decisions.

11  Q.   And based on that, did you look at that issue?

12  A.   Well, I looked at the M code and, again, found

13  that, like the P code, it was missing a lot of the

14  time.

15  Q.   Okay.  And so I just want to make sure we're

16  clear on the record.  With respect to the applicant

17  flow, you found a lot of the data missing; correct?

18  A.   Correct.

19  Q.   And with respect to the P code data, you found a

20  lot of that missing; correct?

21  A.   Correct.

22  Q.   And the same with respect to the M code?

23  A.   Correct.

24  Q.   To your knowledge, did Hilti ever provide you

25  with any data to fill the data gaps that you found?

1   A.    No.

2   Q.    Were you ever provided with an explanation as to

3   why these data gaps existed?

4                MR. MORGAN:   Objection, Your Honor.

5   There's no foundation that he ever asked --

6                THE COURT:   Sustained.   Rephrase.

7   Q.    *(BY MR. SMOLEN)* Did Hilti provide you any

8   documentation -- when you had requested to look at

9   what their expert had looked at, did any of that

10  documentation indicate to you an explanation as to why

11  there were data gaps?

12  A.    No.   It showed the gaps but it didn't show an

13  explanation or a reason for the gaps or reasons for

14  the gaps.

15  Q.    Looking at -- if you would, turn to Plaintiff's

16  Exhibit 51.   And after you've had an opportunity to

17  look at that table, let me know when you're ready.

18  A.    Yes.

19  Q.    Okay.   Do you recognize Plaintiff's Exhibit 51?

20  A.    I do.

21  Q.    What is Plaintiff's Exhibit 51?

22  A.    Well, that's a tabulation of a combination of

23  availabilities, I guess I would call it, is

24  availability -- is there data available for applicant

25  flow and/or promotability and/or mobility.   So, for

1    instance, the first row says yes, yes, yes, meaning

2    that there is some people for whom applicant flow data

3    are available, promotability data are available, and

4    mobility data are available, and the number of such

5    people is 15.

6    Q.    Okay.  And what percentage of the total of the

7    male employees -- or the total employees promoted from

8    inside sales to outside sales had all of these alleged

9    qualification factors indicated in the data?

10   A.    5.3 percent, roughly one in twenty.

11   Q.    And then you also looked at other variations of

12   that, did you not, that indicated whether they had a

13   promotability code or a mobility code and you made

14   different determinations, didn't you?

15   A.    Right.

16   Q.    Would you go ahead and explain to the court what

17   each of these rows indicates?

18   A.    Sure.  Well, the second line says yes, yes, no,

19   and by looking at the column, you can see what the

20   "yes" refers to.  Again, the second line, yes, there

21   is applicant flow data for certain people; yes,

22   there's also promotability data for those people; but

23   there is no M code mobility data for those people, and

24   they are a total of ten people in total.

25   Q.    And then explain, if you would, the next row

*Brian P. Neil, RMR-CRR*
*United States District Court*

1  down, please.

2          THE COURT:  I think all of this is fairly

3  easily understood.

4          MR. SMOLEN:  Okay.  Your Honor, I'd move to

5  admit Exhibit 51, Plaintiff's Exhibit 51.

6          THE COURT:  Any objection?

7          MR. MORGAN:  Same objections as before,

8  Your Honor.

9          THE COURT:  Yes, sir.  Plaintiff's 51 is

10  admitted.

11          MR. SMOLEN:  Thank you, Your Honor.

12  Q.   *(BY MR. SMOLEN)*  Dr. Killingsworth, after you

13  performed this study, did you form any opinions as to

14  how the data gaps you identified impact the analysis

15  conducted by Hilti's expert, Dr. Steward?

16  A.   Well, in a sense, the missing data don't impact

17  the analyses of his that I know about at all because,

18  as I think you asked me previously, he didn't use the

19  P code in any of the analyses I know about and he

20  didn't use the M code.  So as far as those two pieces

21  of data are concerned, it had no effect whatsoever on

22  what he did.

23      However, the availability or lack of

24  availability of applicant flow data had I would

25  think -- I think it's fair to say a profound effect on

1    the quality and meaningfulness of his analyses.

2    Q.    Okay.  Did you find that the gaps in the data

3    were pervasive and significant?

4    A.    Yes.

5    Q.    And did you find that they were so significant

6    that they rendered Dr. Steward's analysis meaningless?

7    A.    Yes.

8    Q.    Leaving aside the missing data, does the

9    available SMD data and applicant flow data provide any

10   information on the promotion of persons from inside to

11   outside sales at Hilti?

12   A.    Well, it tells you that there were some people

13   who had these codes and a lot of others who didn't,

14   and it tells you that some people had good codes,

15   favorable codes, and other people had less favorable

16   codes.  That's about as far as I would feel able to

17   go.

18   Q.    Okay.

19   A.    Again, largely because so much is missing.

20   Q.    Okay.

21   A.    It would be a mistake, I think, to generalize

22   from such a subset of the data, particularly when we

23   don't know what the rest of the data for which things

24   are missing looks like.

25   Q.    Okay.  Let's look at Exhibit 68, the SAP

1    database.  And I'm going to have you look at a

2    particular employee, and his employee code is 33170

3    and his name is Seth M. Spinhirne.  Do you see that?

4    A.    I do.

5    Q.    Okay.  And was he one of the individuals that you

6    identified as promoting from inside sales to outside

7    sales during the relevant time frame?

8    A.    Yes.

9    Q.    And you did that, again, by seeing there on SAP

10   that he went from a wage-earner at a Hilti center to

11   an AM II?

12   A.    Could you scooch it over a little bit?  Sorry.

13   Q.    Keep going.  It's under the job there.

14   A.    Right.

15   Q.    We see he moved from a Hilti center rep;

16   correct?

17   A.    To AM II.  Sorry.

18   Q.    To AM II.  You understood that to be an inside

19   sales promotion to outside sales; correct?

20   A.    Yes.  And that happened on December 3rd of

21   2007.

22   Q.    And because it happened on December 3rd of 2007,

23   that was in your relevant time frame that you

24   studied?

25   A.    Correct.

1   Q.   Okay.  Now --

2   A.   It was in 2005 to 8.  I'm not opining about

3   what's a relevant time period or not.

4   Q.   Okay.

5   A.   That was within the parameters of the time period

6   I was given.

7          MR. SMOLEN:  And, Simon, if you would,

8   could you pull up the February 2006 customer service

9   department, I believe it's Exhibit 79.

10  Q.   *(BY MR. SMOLEN)*  And did you find his name to

11  appear also in the SMD data?

12  A.   Yes.

13  Q.   Okay.  And is it here on the screen that says

14  same employee code, 33170?

15  A.   Yes.

16  Q.   And his name was Seth Spinhirne again; correct?

17  A.   Yes, yes.

18  Q.   And the P code that was indicated for

19  Mr. Spinhirne was a P5; correct?

20  A.   Correct.

21  Q.   And did you understand that to be a promotability

22  code associated with someone who was not capable of

23  being promoted?

24  A.   Well, it was the least favorable P code that

25  could be given.

1   Q.   Okay.  And, again, we have missing data on the M

2   code; correct?

3   A.   Correct.  Nothing that says how mobile he is or

4   isn't.

5            MR. MORGAN:  Your Honor, I move to strike

6   this entire line of questioning because he was

7   promoted in '07, the end of '07, and what we're

8   looking at is February '06 when he's P5, which means

9   he's a new employee basically.  So this is

10  meaningless.

11           MR. SMOLEN:  Can I respond?

12           THE COURT:  All right.  Go ahead, sir.

13           MR. SMOLEN:  Your Honor, this was the last

14  rating -- and this is all information that has been

15  admitted and provided by Hilti -- but this was the

16  last rating that Mr. Spinhirne was rated under SMD.

17           THE COURT:  Well, once again, you're

18  testifying.  You cannot testify here.

19           MR. SMOLEN:  I'll ask the expert then.

20           THE COURT:  I cannot take testimony from

21  the attorney.

22           MR. SMOLEN:  Thank you.

23           THE COURT:  All right.  Go ahead.

24  Q.   *(BY MR. SMOLEN)*  Dr. Killingsworth, did you find

25  Mr. Spinhirne in any other SMD data?

1   A.    I don't think so, no.

2   Q.    Okay.  So was the last available data that you

3   had to look at this data that's before you in Exhibit

4   79?

5   A.    As far as -- as far as I'm aware, yes.

6   Q.    Okay.  And the last SMD P rating that was

7   provided or assigned to Mr. Spinhirne was what?

8   A.    The P code you mean or --

9   Q.    Yes, the P code.

10  A.    It was P5.

11  Q.    Okay.  And based on your review of the SMD data,

12  was the last -- did you ever find any mobility code

13  entered into the information?

14  A.    I don't think so, no.

15  Q.    Okay.  And as we go across and we look at the PMP

16  information from '06, '07, '08, and '05, did you find

17  any PMP information as it pertained to Mr. Spinhirne

18  in any of the SMD data?

19  A.    No.  There isn't one shown in any of those

20  columns for any of the years.

21  Q.    But you, by looking at the SAP data, determined

22  that he did, in fact, promote; correct?

23  A.    Yes, you can see that.  In fact, we just saw it.

24          MR. MORGAN:  Your Honor, I'm going to renew

25  my motion to strike his testimony at this point

1    because this -- number one, he's in customer service

2    at this point.  The prior document showed that he

3    promoted out of a Hilti center.  It's obvious that

4    he's comparing apples to oranges here.

5            THE COURT:  All right.  Well, he'll be

6    subject to cross-examination in this regard.  Also,

7    again, he testified here that there was no PMP code

8    for 2006, 7, or 8.  Obviously if this was done in

9    February '06, there wouldn't be a PMP code for 6, 7,

10   or 8; correct?

11           THE WITNESS:  Correct.

12           THE COURT:  I'll take all of this into

13   consideration given that his promotion occurred in

14   December of '06 and this particular SMD data was

15   February '06 and we'll see if there's any other SMD

16   data out there.

17           MR. SMOLEN:  Thank you, Your Honor.

18           THE COURT:  Go ahead.  And the motion to

19   strike will be denied.

20   Q.   *(BY MR. SMOLEN)* Looking at Exhibit 52, do you

21   recognize Exhibit 52, Dr. Killingsworth?

22   A.   Yes.

23   Q.   And what is Exhibit 52, if you would, please?

24   A.   Well, that tabulates the number of people by

25   promotability code, how many got P1, P2, and so forth.

1    Q.    Okay.   And what was your understanding as to the

2    difference between P1 and P5?

3    A.    Well, the lower the number, P1, the better the

4    rating, the more promotable you are considered to be

5    according to that rating scheme.

6    Q.    And looking at Exhibit 34, which has been

7    previously admitted -- I'm sorry -- Plaintiff's

8    Exhibit 35, specifically paragraph 9, take a minute,

9    Dr. Killingsworth, to review paragraph 9 of Exhibit

10   35, if you would, please?

11   A.    I see it.

12   Q.    And was Ms. DeGiacomo's description of the P

13   codes consistent with your understanding when you were

14   conducting your analysis?

15   A.    Yes.

16   Q.    Thank you.   Did you draw any conclusions from

17   your review of this data?

18   A.    Well, again, primarily there are a lot of people

19   with missing data, and sometimes, since these are all

20   for people who are promoted, it was a little

21   surprising to see that in some cases the ratings

22   weren't at the top, they weren't P1s.   It wasn't the

23   case that everybody promoted was a P1.   I guess that's

24   the simplest way to put it.

25   Q.    Have you ever been provided with any explanation

1   as to why nearly half of the promotions to outside

2   sales were P5s --

3                   MR. MORGAN:  Objection, Your Honor.

4   Objection, Your Honor.  Provided by whom and who had

5   any obligation to provide him anything?

6                   THE COURT:  Sustained.

7   Q.   *(BY MR. SMOLEN)* Let's look -- did you draw any

8   conclusions from this data?

9   A.   Well, I think I just stated them.

10  Q.   Okay.

11  A.   First of all, a lot of promotability codes are

12  missing; and secondly, a lot are not P1.

13  Q.   With respect to those that we did have

14  promotability codes, I'd have you look at your

15  supplemental report to see if this refreshes your

16  memory as to what your finding was, specifically page

17  4 of the supplemental report.

18                  MR. MORGAN:  Objection, Your Honor.  He

19  hasn't testified that his memory is faulty in this

20  regard.

21                  THE COURT:  Sustained.

22  Q.   *(BY MR. SMOLEN)* Do you recall every opinion that

23  you made regarding the P code --

24  A.   No.

25  Q.   -- findings?

1    A.    No.

2    Q.    Would it help refresh your memory if I were to

3    have you look at your supplemental report?

4    A.    Absolutely.

5    Q.    Okay.

6    A.    I rarely hold a lot of things in memory.  I

7    prefer to work with paper.

8              MR. MORGAN:  Your Honor, I object.  I mean,

9    he hasn't asked a specific question.  He's just asked,

10   do you remember everything you've put in your

11   report.

12             THE COURT:  That's correct.  The

13   objection's sustained.  We have to get an inability to

14   remember with regard to a specific question.

15   Q.    *(BY MR. SMOLEN)*  Do you recall your opinion in

16   its entirety as it pertained to your analysis on

17   the -- or on the P code information that was contained

18   in the SMD data?

19   A.    Well, as far as that goes, I think I already said

20   it.  First of all, the P code appeared to be missing

21   for a large number of people; and secondly, for a

22   large number of people, the P code that they got was

23   not P1, it was something lower than that.

24   Q.    Did you make any findings, or do you recall

25   making any findings, as to individuals who were

1    promoted that had the least promotable code?

2    A.    Well, I think we saw one.

3    Q.    I identified one for you but --

4    A.    Right.  Well, there were various others.  I

5    didn't create a list of individual people, if that's

6    what you mean, who had a P5 or, let's say, a P4.

7    Q.    Did you find that a substantial number of persons

8    who were the least promotable were nevertheless

9    promoted?

10   A.    That appears to be the case, yes, that's right.

11   Q.    Okay.

12            THE COURT:  You understand, Doctor, here

13   you agreed with the terms as set forth in Plaintiff's

14   35, that P5 related to people who had been in the

15   position for six months or less; right?

16            THE WITNESS:  Right.

17            THE COURT:  Not in a position long enough

18   to be rated?

19            THE WITNESS:  Right.

20            THE COURT:  You understand that in the one

21   example I've been given, Seth Spinhirne, this man was

22   rated P5 in February of '06; correct?

23            THE WITNESS:  Correct.

24            THE COURT:  He was not promoted until

25   December of '07; correct?

1          THE WITNESS:  Correct.

2          THE COURT:  He would not have been a P5 in

3  December '07 because he had obviously been in the

4  position for six months or more; correct?

5          THE WITNESS:  Correct.

6          THE COURT:  Let's move on.

7  Q.    *(BY MR. SMOLEN)*  Looking at Plaintiff's Exhibit

8  53, do you recognize Plaintiff's Exhibit 53?

9  A.    I do.

10  Q.    And what do you recognize that exhibit to be?

11  A.    That's a simple tabulation of the mobility code

12  for people who had one.

13  Q.    And what did you find with respect to

14  individuals' mobility codes?

15  A.    Well, there were a lot of people, nearly half,

16  who were rated most mobile, and there were 18 or 19

17  percent who were rated least mobile, and about 35

18  percent who were rated in between --

19  Q.    Okay.

20  A.    -- of the ones with a rating.  And, again, I

21  would want to emphasize that not everybody had a

22  rating.  Of course we've seen that.

23  Q.    This is limited to those employees whose SMD data

24  did contain mobility codes; correct?

25  A.    Correct.

1   Q.    Okay.  And what did you find with respect to the

2   M code data?

3   A.    Well, in this case, that among those who were

4   promoted, the mobility code ranged from the top to the

5   bottom.

6   Q.    Forty-six percent for the most mobile and

7   eighteen percent to the least mobile; correct?

8   A.    Right.

9   Q.    Did you draw any conclusions from the available M

10   code data?

11   A.    Well, I think, just as has been stated, the prior

12   thing which I think is important is that not everybody

13   has a mobility code, and I think you can't really look

14   at table 4 without recalling that.  So that's an

15   important -- maybe not caveat -- but an important

16   thing to underline.  And then secondly, people are

17   promoted when they have mobility codes of 2 or 3.

18   Q.    Okay.  Essentially people were promoted despite

19   their mobility code being nonmobile or restricted;

20   correct?

21            MR. MORGAN:  Objection, Your Honor.  It's

22   not a despite.  I mean, there's been no tie-in to

23   where these people that he's studied wanted to go.

24            THE COURT:  Sustained.  This is a

25   statistical analysis.  Objection sustained.

1          MR. SMOLEN:  Okay.  One second, Your Honor.

2          THE COURT:  Yes.

3              *(Discussion held off the record)*

4          MR. SMOLEN:  Your Honor, we'd move to admit

5     Plaintiff's Exhibit 53.

6          THE COURT:  Any objection to 53?

7          MR. MORGAN:  Yes, Your Honor.  It's

8     completely meaningless and there hasn't been an

9     adequate foundation that it applies to anything, any

10    issue in this case.

11         THE COURT:  Overruled.  I think, as the

12    professor says, probably the most meaningful aspect of

13    this is that only 103 of the 282 had mobility codes.

14    The Exhibit No. 53 is admitted.

15         MR. SMOLEN:  Thank you.

16    Q.    *(BY MR. SMOLEN)*  Did you have any understanding

17    as to whether, quote, a future job identified was

18    supposed to play a role in the Hilti promotional

19    process?

20    A.    I think so.  It's recorded in the data.

21    Q.    Okay.

22    A.    And I looked at that as well.

23    Q.    Did you look at the available future job

24    identified data?

25    A.    I did, yes.

1    Q.    And did you study that data?

2    A.    In the same way that I studied these other, the P

3    codes and the M codes and so forth.  I basically

4    tabulated them, I didn't do a fancy statistical

5    analysis.

6    Q.    Okay.  If you would, look at Plaintiff's Exhibit

7    55, please.

8    A.    Whoops.  Yes.

9    Q.    Do you recognize Plaintiff's Exhibit 55?

10   A.    I do.

11   Q.    What is Plaintiff's Exhibit 55?

12   A.    Well, that's a list of the entries in the field

13   for future job identified in the data, and most of the

14   time, 90 percent or so, this is simply not given.

15   Q.    When you --

16   A.    So a scattering, a handful, of people have some

17   sort of future job identified, future job at Hilti,

18   but the vast bulk of people don't have anything in

19   there.  So I can only speak about what's recorded in

20   the data, but what's recorded in the data is a big

21   blank for a lot of people.

22   Q.    And I believe you found it was 90.4 percent of

23   those promoted had not identified a future job?

24   A.    Correct.  Well, I'd hesitate to say that.  I

25   don't know who did the identifying, but whoever did

1    the identifying didn't do any identifying for most of

2    the people here.

3    Q.   Okay.  And those, again, were just limited to the

4    one -- the individuals who were promoted from inside

5    to outside sales; correct?

6    A.   Right.

7    Q.   Do you recall looking also at PMP ratings when

8    you were studying those alleged qualifications that

9    Dr. Steward had opined on regarding promotability?

10   A.   Yes.

11   Q.   If you would, look at Plaintiff's Exhibit 54,

12   please.

13   A.   Yes.

14           MR. SMOLEN:  Oh, I'm sorry, Your Honor.

15   Can we move to admit Plaintiff's Exhibit 55?

16           THE COURT:  Any objection?

17           MR. MORGAN:  If I may voir dire the witness

18   about that, I would appreciate it.

19           THE COURT:  Yes, sir.  Go ahead.

20           MR. MORGAN:  If you would put it back up,

21   Simon, I would appreciate it so I don't have to take

22   the time.

23                   **VOIR DIRE EXAMINATION**

24   BY MR. MORGAN:

25   Q.   Sir, did you make any attempt to exclude Canadian

1   employees?

2   A.    No.

3   Q.    So this includes employees in Canada as well as

4   the United States?

5   A.    Well, this includes the people who were promoted

6   from inside to outside sales.

7   Q.    Yeah.  But you've also included Canadians in

8   there?

9           MR. SMOLEN:  Objection, Your Honor.

10  There's no evidence.  If Mr. Morgan would like to show

11  he's included a Canadian --

12  Q.    *(BY MR. MORGAN)*  Okay.  How about Toronto?

13          THE COURT:  Overruled.  Go ahead.

14  A.    Well, my understanding is that this doesn't tell

15  us where somebody was currently employed or about

16  their citizenship.  This tells you that a future job

17  was identified, and I guess in this case in Toronto,

18  for that person, but that's different from saying

19  they're in Toronto now.  This is a future job.

20  Q.    *(BY MR. MORGAN)*  Okay.  And you don't have any

21  team leaders listed?

22  A.    By that, do you mean people who were team

23  leaders --

24  Q.    People who wanted to become team leaders.

25  A.    Oh.  This was what was in there.  Well, there's a

1    senior team leader, yes.

2    Q.    But no team leaders?

3    A.    Not that I can see, no.  Not here.

4    Q.    Did you look at the 2005 data for customer

5    service?

6    A.    Yes.

7    Q.    And you saw no team leaders?

8    A.    Well, where?

9    Q.    In future job or --

10   A.    I don't think so, no.

11   Q.    Okay.  And did you look at 2006?

12   A.    Yes.

13   Q.    Did you see any team leaders listed there?

14   A.    No.  I don't think so, no.

15   Q.    Okay.  I guess we're going to have to get out the

16   documents.

17        Okay.  This is the 2006 -- February 2006

18   document.  You see where people are in the column here

19   where people are indicating what they want to become,

20   senior team leader or AM, things of that nature?

21   A.    Okay.

22   Q.    See --

23   A.    Would you mind skating up so I can see the column

24   heading?  Oh, no.

25   Q.    Oh, did we pass it?  Yeah.  Potential next step.

1    A.    Okay.

2    Q.    And then we've got follow Charles, could go pro

3    shop.  I don't see that one listed.  Senior team

4    leader here, we got team leaders, we got logistics, we

5    got marketing, we got HR.  So you didn't take those

6    into account in your document that you created here,

7    did you?

8    A.    I'd have to check that.

9    Q.    Well, let's check it.

10              MR. MORGAN:  Could you put that back up,

11   please, Simon?  What document -- what trial exhibit we

12   were looking at?

13              THE COURT:  55.

14              MR. MORGAN:  55.  I'll just do it myself.

15   I apologize, Your Honor.  There we go, F, future job

16   identified, 55.

17              THE COURT:  That's what I have on table

18   6.

19              MR. SMOLEN:  Plaintiff's 55.

20              THE COURT:  Somehow your 55 is my 54.

21              MR. MORGAN:  54.  Okay.  Well, I just used

22   what they gave me.  Simon, would you mind putting that

23   Plaintiff's 55 up?

24              MR. SMOLEN:  Table 6.

25              MR. MORGAN:  Okay.  Plaintiff's 55.

1   Q.   *(BY MR. MORGAN)*  Do you see any team leaders

2   there?

3   A.   No, I don't.

4   Q.   You don't see any of those that we just went

5   over, HL, AL?  That's not listed; correct?

6   A.   I don't see them, no, that's right.

7   Q.   And I think there was some marketing and some

8   things like that.  Those aren't listed either, are

9   they?

10  A.   I don't remember marketing, but I would have to

11  check and go back and look.

12          MR. MORGAN:  Your Honor, I would move to

13  exclude this.  It's absolutely incomplete and he used

14  the wrong methodology in compiling it.

15          MR. SMOLEN:  Your Honor, can I ask

16  Dr. Killingsworth just a couple questions?

17          THE COURT:  Of course.

18  Q.   *(BY MR. SMOLEN)*  Mr. Killingsworth, the names

19  that Mr. Morgan showed you where they had identified

20  team leader positions, this table you prepared is just

21  for those persons who were actually promoted;

22  correct?

23  A.   Correct.

24  Q.   You didn't look at future job identified for

25  people, such as Ms. Tabor, who had identified team

*Brian P. Neil, RMR-CRR*
*United States District Court*

1    leader who weren't promoted, did you?

2    A.    Right.  No.

3    Q.    Okay.

4              MR. SMOLEN:  Your Honor, this table -- the

5    title of this table 6 is, future job identified for

6    persons, quote, promoted from inside sales to outside

7    sales.

8              THE COURT:  I understand.  Plaintiff's 55

9    is admitted.

10             MR. SMOLEN:  Thank you, Your Honor.

11   Q.    *(BY MR. SMOLEN)*  Dr. Killingsworth, I'm going to

12   have you focus now a little bit more on the rebuttal

13   again to Dr. Steward's report.  If you would, take a

14   look at Plaintiff's Exhibit 56.  What does Exhibit 56

15   depict?

16   A.    Well, it tells us that there were a great number

17   of people who were promoted from inside to outside

18   sales over this whole period who weren't in the

19   applicant flow log at all.

20   Q.    Did Dr. Steward utilize the applicant flow logs

21   in his analysis?

22   A.    He did.  And, in fact, so far as I am aware --

23   and I looked at his report very thoroughly --

24   that's -- the only study that he talks about about

25   promotions from inside to outside sales relies

1    exclusively on the applicant flow log.

2    Q.    Based on your analysis of the lack of applicant

3    flow log data, did Dr. Steward omit promotions that

4    occurred from 2005 to 2008?

5    A.    He omitted a great -- well, I didn't know if he

6    omitted them, but he didn't study them because they

7    weren't in the applicant flow data.

8    Q.    About how many promotions did Dr. Steward omit

9    from the analysis?

10   A.    Roughly 90 that weren't in the applicant flow

11   log; 92 I think it is.

12   Q.    And did you make a finding that that was

13   two-thirds of the actual promotions that took place?

14   More than two-thirds --

15   A.    Yeah.

16   Q.    -- were not accounted for by Dr. Steward?

17   A.    No, no.  The other way around, I think.

18   Eighty-three weren't in the applicant flow log for

19   men, and nine weren't in the applicant flow log for

20   women.

21   Q.    And, again, was it your understanding that

22   Dr. Steward I believe in paragraph 19, and then

23   attached a picture graph to that, made a final

24   determination that nine women were promoted during the

25   relevant -- or the identified time period and that

1    -- nine women and --

2                MR. SMOLEN:   One second, Your Honor.

3    Q.    *(BY MR. SMOLEN)*  Did you come to the conclusion

4    that Dr. Steward had reached an erroneous finding that

5    nine women were promoted in Hilti?

6    A.    That's clearly erroneous.  A good deal more women

7    than that were promoted at Hilti.

8    Q.    But even though more women were promoted, you

9    still found a statistical disparity in the promotional

10   rate?

11   A.    Oh, yes.  Yeah, it's quite strong.

12   Q.    Did you, yourself, go back and look at the

13   processes that Dr. Steward used to come up with this

14   erroneous conclusion?

15   A.    Yes.

16   Q.    What did you determine from your review of

17   his data that he provided to you?

18   A.    Right.  Well, a great deal of what he did, I

19   believe, is completely erroneous.  He says, I think,

20   if I remember correctly, that he studies promotions

21   from 2005 to 8.  However, if you actually look at the

22   study that he mentions, the only one about internal

23   promotions that he does mention, he doesn't, in fact,

24   study any promotions that occurred during 2005.

25   Q.    Okay.

1    A.    So that's for starters.

2    Q.    Okay.

3    A.    Secondly, he also doesn't study, because of

4    course it's impossible to study, any promotions that

5    don't appear in the applicant flow log.

6         And finally, the applicant flow log -- I think I

7    mentioned this this morning -- has various quirks and

8    problems and gaps.  So, for example, instead of saying

9    that someone was hired or promoted, they will say that

10   the person was, quote/unquote, a candidate.  And if

11   you look in the SAP data, it turns out that that's

12   actually somebody who was promoted but Dr. Steward's

13   programming ignored that so that person got counted as

14   a nonpromotion.

15   Q.    When, in fact, they were promoted?

16   A.    When, in fact, they were promoted.  And so that's

17   what I would call a false negative.  Is that right?

18   They weren't -- that's right.  They're classified by

19   him as not having been promoted but they actually

20   were.  So that's a false negative.

21        And he also has false positives in the sense

22   that if you -- if you look at the people whom he

23   classifies as having been promoted, you find that the

24   promotion occurred either at hire, meaning they

25   weren't promoted from inside, they got the outside

1     sales job at entry; or alternatively, that they had

2     been promoted well before 2005, and so therefore, they

3     didn't get promoted within the relevant time interval.

4     So I would call those false positives because they're

5     not actual promotions that occurred between 2005 and

6     2008.  So there are a lot of problems.

7          Another example:  In order to identify people as

8     being internal candidates, Dr. Steward looked at some

9     entries in some of the columns that would say, as the

10    source of referral, our Web site, or words to that

11    effect, which would tell you -- or current employee is

12    another example.  That leaves out people who were

13    current employees -- there are three or four of

14    them -- who only have referral listed, and his

15    programming overlooks the fact that they are in

16    fact -- were, in fact, genuine employees at the time

17    that they appeared in the Monster -- I'm

18    sorry -- applicant log.

19         So there are errors going both ways, promotions

20    that actually were promotions that are incorrectly

21    classified as nonpromotions, and the reverse.

22    Q.   And I want to make sure I understand you

23    correctly, that these erroneous findings left

24    essentially an erroneous result?

25    A.   Well, that's right.  And I would say far and away

1   the most important problem with the result is that

2   it's not based on anything like a full deck of

3   employees because the applicant flow log don't give

4   you the full deck.

5   Q.    Okay.  They were grossly incomplete; correct?

6   A.    That's right.

7   Q.    Have you seen any data which indicates that few

8   males or females in inside sales wanted to be

9   relocated or transferred to outside sales because of

10  the harsh working conditions?

11  A.    I've seen nothing about harsh working conditions

12  one way or the other.

13  Q.    Did you see a document that the defendant had

14  relied upon that indicated that both men and women

15  were not interested in promoting to outside sales?

16  A.    Oh yes.  Yeah.  In fact, that's in Dr. Steward's

17  report.

18  Q.    Correct.

19  A.    He quotes a manager of customer service saying

20  something like, I've never been interested in outside

21  sales and the majority of men and women in customer

22  service are not interested in outside sales.

23  Q.    And do you recall whether that was Christy

24  Graybill's affidavit?

25  A.    That's right, yes.

1   Q.   Does that seem --

2   A.   Well, it's -- Dr. Steward quotes her -- quotes

3   the affidavit rather.

4   Q.   Okay.  And Dr. Steward puts that into his report;

5   correct?

6   A.   Right.

7   Q.   And as you're looking at that information, if it

8   was, in fact, the case that men and women were not

9   interested in promoting to outside sales, would that

10   in any way impact your analysis?

11   A.   No.

12   Q.   Why is that?

13   A.   Well, for two reasons.  First of all, if both men

14   and women in customer service are expressing a

15   reluctance -- not, I guess, an absolute refusal but at

16   least, you know, a reluctance -- that has no sex cut,

17   as it were.  Of course, that's not a statistical

18   analysis anyway.

19        But the other thing is that I took account of

20   Hilti area in the Cox regressions, so that to the

21   extent that the men and women in customer service are

22   less keen on going into outside sales than people in

23   other Hilti areas, I'm picking that up with the

24   variable for Hilti area which is in those Cox

25   regressions.

1          MR. SMOLEN:  One minute, Your Honor.  I

2    just need to confer with counsel.  I think we might be

3    finished.

4               *(Discussion held off the record)*

5          MR. SMOLEN:  Your Honor, I just need one

6    second to go back through and make sure we have

7    admitted the exhibits.  Do we have 52 admitted?

8          THE COURT:  No, sir.

9          MR. SMOLEN:  I would move to admit

10   Plaintiff's Exhibit 52.

11         THE COURT:  Any objection?

12         MR. MORGAN:  Same objection as usual, Your

13   Honor.  He hasn't tied it into the actual dates of the

14   promotions, it's completely unreliable, the method

15   used was completely unreliable.  He compares 2007

16   promotions to people who were listed in 2006.  It's

17   totally unreliable.

18         THE COURT:  This does give me some pause

19   here, Mr. Smolen, one, in terms of specifically how P5

20   is characterized.  I mean, it is in a sense least

21   promotable, but it -- under Plaintiff's 35 it's more

22   specifically and more precisely defined as those who

23   were not in the position long enough to be rated.

24        And given the one example that you gave me of

25   the individual who was actually promoted some, I

1    believe, 22 months later, obviously the fact that he

2    was rated P5 in February of 2006 doesn't mean that

3    he's P5 in December of 2007 when he's promoted.

4         The reliability here, at least as to that P5

5    category and as to their P ranking at the time, given

6    that these P ratings are time-sensitive -- and I

7    understand your point that this is the last P rating

8    that this witness found.  But if it was found 22

9    months before the person is promoted and these P

10   ratings are, in fact, time-sensitive, particularly P5,

11   it calls into question the reliability of this

12   exhibit.

13        MR. SMOLEN:  Can I respond to that?  The

14   SMD data, though, what we've already established

15   through the testimony both when defendant was crossing

16   the witness is that they relied on the SMD data for

17   promotions.  And if the SMD data only contains a P5

18   rating, then that's, in fact, what managers had to

19   rely upon.  If the defendant were --

20        THE COURT:  You've already established

21   through the testimony specifically.

22        MR. SMOLEN:  The witnesses talked about SMD

23   data, had it applied to the promotion process, would

24   SMD data be used, was it supposed to be used for the

25   promotion process, were you supposed to be a P1 before

1    you could promote.

2         My point is that this is the data that the

3    managers are looking at.  Regardless of whether or not

4    whether or not this individual ultimately became a P1,

5    if the company has a record of that, they can

6    certainly impeach Dr. Killingsworth with it.  But it's

7    my understanding that there is no data that indicates

8    that he ever became a P1.  And I can walk you

9    through --

10              THE COURT:  Now, wait, wait.  You've given

11   me one example --

12              MR. SMOLEN:  I can give you more.

13              THE COURT:  -- of a P5 in February of 2006.

14   He's clearly not within the six months of hire in

15   December of 2007.  I mean, I can admit it for, quote,

16   what it's worth but I'm not sure it's worth very much.

17              *(Discussion held off the record)*

18              THE COURT:  All right.  We'll admit this

19   for whatever it may be worth, Plaintiff's Exhibit

20   No. 52.  Go ahead.

21   Q.   *(BY MR. SMOLEN)*  Dr. Killingsworth, in

22   Plaintiff's Exhibit 52 in the data that you reviewed,

23   you found that 33 of those individuals had -- the last

24   P code rating was a P5 --

25              THE COURT:  You are leading your witness.

1    Q.    *(BY MR. SMOLEN)*  Dr. Killingsworth, tell us what

2    you --

3                THE COURT:  Let this witness testify,

4    please, Mr. Smolen.

5                MR. MORGAN:  Your Honor, we've covered all

6    of this before.

7                THE COURT:  I think we have.  Anything

8    further, Mr. Smolen?

9                MR. SMOLEN:  I just need to make sure we've

10   admitted Exhibit 53.

11               THE COURT:  Yes, sir.

12   Q.    *(BY MR. SMOLEN)*  Mr. Killingsworth, did you have

13   something?

14   A.    I am deeply embarrassed but I just noticed a

15   typo.

16   Q.    Okay.

17   A.    And I think it's an important one so I think I

18   better correct it.

19               THE COURT:  Please.

20   Q.    *(BY MR. SMOLEN)*  Okay.

21   A.    In Exhibit 56, which is also called table 7, that

22   lists the people in the applicant flow log and not in

23   the applicant flow log by sex; right?  And the number

24   should be reversed.  I don't know how that happened.

25   But the number of men in the applicant flow log is 83

1    and the number of men not in the applicant flow log is

2    165.

3    Q.    Okay.

4    A.    And furthermore, for women, the number in the

5    applicant flow log is nine.  That's where Dr. Steward

6    got his nine women from.  And not in the applicant

7    flow log there are 25.

8          Now, in expiation of this sin, I can point to

9    chapter -- to paragraph 15 in Exhibit -- well, my

10   supplemental declaration because that gets it right.

11   Q.    Okay.

12   A.    I don't know how it happened but I obviously just

13   transposed the lines here.

14   Q.    Okay.

15   A.    But it does say 9 women were in the applicant

16   flow log in that report and 83 men were in the

17   applicant flow log.  So the vast bulk of people were

18   not in the applicant flow log but that's what I was

19   saying.  I humbly apologize for this mistake but

20   fortunately it's not material.

21   Q.    Okay.  We essentially reversed the numbers and

22   you came to the same conclusion that you did in your

23   supplemental report; correct?

24   A.    Well, just in the table, correct.  The numbers in

25   the table should be the reverse.

1    Q.    Okay.

2    A.    But the text -- as I say, the text gets it right.

3    So this was just a mistake, not a computational error

4    or something.  I just typed in the wrong number on the

5    wrong line.

6                    MR. SMOLEN:  Okay.

7                    THE COURT:  Anything further, Mr. Smolen?

8                    MR. SMOLEN:  Have we admitted 54?

9                    THE COURT:  No, we have not.

10                   MR. SMOLEN:  We'd move to admit 54.

11                   THE COURT:  Any objections?

12                   MR. MORGAN:  Your Honor, I think it's

13   subject to all of the same objections, Your Honor,

14   because the methodology this gentleman applied is

15   obviously flawed in terms of coming up with

16   performance ratings.  We don't know when they were

17   made or what the significance of them are.  It's

18   pretty worthless information and irrelevant.

19                   THE COURT:  Just so I understand, these are

20   the most recent performance ratings for the

21   individuals promoted from inside to outside sales that

22   you found?

23                   THE WITNESS:  Yeah.

24                   THE COURT:  All right.  Plaintiff's 54 is

25   admitted.

```
 1                    MR. SMOLEN:  Did we admit 55?

 2                    THE COURT:  Yes.

 3                    MR. SMOLEN:  56?

 4                    THE COURT:  No, I don't believe so.  Did

 5     we, Mr. Overton?

 6                    DEPUTY COURT CLERK:  I don't have it in --

 7                    THE COURT:  No.  Any objection to 56?

 8                    MR. MORGAN:  No, Your Honor.

 9                    THE COURT:  56 is admitted.

10                    MR. SMOLEN:  I think that's all I have,

11     Your Honor.

12                    THE COURT:  Very well.  Cross-examination.

13                    MR. MORGAN:  Your Honor, may I ask for a

14     break?

15                    THE COURT:  Yes.  We'll take a short

16     recess.

17                         (Short break)

18                    THE COURT:  Cross-examination.

19                    MR. MORGAN:  Thank you, Your Honor.

20                    CROSS-EXAMINATION

21     BY MR. MORGAN:

22     Q.   Hello, Dr. Killingsworth.  In your analysis, you

23     basically looked at the number of males in

24     customer -- in what you call the inside sales versus

25     the number of females in inside sales; correct?
```

1    A.    That was one of the analyses, yes.

2    Q.    And then you looked at the number of promotions

3    from promotions of males and promotions of females

4    from what you call the inside sales for 2005 to

5    2008?

6    A.    That was one of the analyses, yes.

7    Q.    And what other analyses did you do?

8    A.    Well, I would mention specifically the Cox

9    regression analysis.

10   Q.    Okay.  But basically, you operated on that set of

11   data, the population --

12   A.    Yes.  And the SAP data, correct.

13   Q.    Yeah.  And for that, you didn't rely on any SMD

14   data?

15   A.    I did not, no.

16   Q.    Okay.  In your analysis at all?

17   A.    That's right.

18   Q.    And you didn't rely on applicant flow data?

19   A.    That's right.  Not for the analysis I did in my

20   first report.  I described some tabulations and

21   analyses of the applicant flow data later but not

22   first.

23   Q.    I mean, your later analysis of applicant flow was

24   showing why it shouldn't be used in this process;

25   right?

118

1   A.    Why I wouldn't rely on it, yes.

2   Q.    Why you would not rely on it?

3   A.    Correct.

4   Q.    Okay.  So you didn't rely on applicant flow data

5   and you didn't rely on the SMD sheets to do your

6   analysis?

7   A.    To do any of the analyses, that's correct, yes.

8   Q.    Okay.  And all of your analyses, except for

9   perhaps one where you took out the pro shops, I mean,

10  everything was included, customer service department

11  here in Tulsa, it included Hilti centers across the

12  nation, and pro shops with the exception of one study

13  that you did, correct, where you took out the pro

14  shops?

15  A.    Yes.  The Cox regressions, which we can go into

16  further if you'd like, identified separately each of

17  the different areas at Hilti.

18  Q.    Okay.  And in terms of your charts that have been

19  admitted here, none of those charts break out the

20  three separate types of what you call inside sales,

21  the base market?

22  A.    I think that's right, except in kind of a

23  backwards way, because some of the analyses don't

24  include the pro shops, that's right.

25  Q.    All right.  So all of the analyses include

```
 1      customer service and Hilti centers?
 2      A.    I think that's right, yes.
 3      Q.    Why did you take the pro shops out?
 4      A.    Basically because counsel asked me to.
 5      Q.    Okay.  Because it yielded a better statistic for
 6      you?
 7      A.    No.  In fact, I wasn't aware of what was going to
 8      happen until I actually took it out.  You never
 9      know.
10      Q.    Did you actually do the statistics or did you
11      check his?
12      A.    What?  No, I did my own.
13      Q.    All of these documents you drafted yourself?
14      A.    Yes.
15      Q.    You drafted --
16      A.    Right down to the mistake that I made in that
17      last table we talked about.
18      Q.    Okay.  And in terms of the documents you looked
19      at, you never saw the deposition of Christy Graybill?
20      A.    Well, actually I did.
21      Q.    Well --
22      A.    Not to begin with, but it was quoted at some
23      length in --
24      Q.    Graybill, Christy Graybill?
25      A.    Yes, yes.
```

1    Q.    And did you put that in your report that you

2    studied that?

3    A.    No, no.

4    Q.    And why not?

5    A.    Not in first report, no.  I quoted --

6    Q.    Not in the first report.  The first report you

7    only looked at two documents, you looked at account

8    managers, 2005 to 2008, and you looked at all data?

9    A.    I agree with you.

10   Q.    Right.  And then your second report, did you look

11   at the deposition of Christy Graybill when you did

12   your second report?

13   A.    I think I quoted from it.

14   Q.    I think you did not.

15   A.    Oh, well, then I may be confusing her with

16   another Christy.

17   Q.    Christy Ouverson?

18   A.    Oh, okay.  My mistake.

19   Q.    Did you see Christy Graybill's --

20   A.    No.  But I -- well, all right.  I'm getting the

21   two Christys mixed up and I apologize.  But one of

22   the --

23   Q.    You put a complete list of the documents you

24   relied on in completing your reports in your reports,

25   did you not?

121

1   A.    Either that or else I identified what I was

2   citing when I cited it, which is standard practice for

3   me.

4   Q.    Okay.  Did you look at the affidavit of Shannon

5   DeGiacomo in doing either of your reports?

6   A.    No, I don't think I did.

7   Q.    And do you recall if you looked at Plaintiff's

8   Exhibit 20, which was the SMD red thread process

9   manual?

10   A.    I had it and I think I looked at it.  I certainly

11   looked at it just last week to refresh my memory.

12   Q.    Okay.  Well, let's look at what you said.  You

13   agree that the first two report you only put two

14   documents in there as having been relied upon?

15   A.    That's correct.

16   Q.    The account managers and the all data?

17   A.    All data -- oh, oh, the SAP data.  I'm sorry.

18   Yes.

19   Q.    Okay.  Well, let's look at what you listed in

20   your second report as having relied upon, okay?  Do

21   you recognize this as your supplemental report?

22   A.    Yes.

23   Q.    Preparation of my supplemental decision, attached

24   is a list of documents I considered.

25   A.    Right.

1    Q.    And here they are.  Report of Steward, and then I

2    don't see any down here -- you got the depositions

3    transcript of Steward and the deposition transcript of

4    Ouverson.

5    A.    Right.

6    Q.    You don't list either Shannon DeGiacomo, you

7    don't list Christy Graybill, you don't list Jennifer

8    Patuto, and you don't list Natalie Sanders.  You don't

9    list a number of depositions that were taken with

10   regard to the documents that are involved in this

11   case.  Why is that?

12   A.    Well, I was analyzing the data themselves.

13   Q.    Yeah.  But you also said you even quoted from

14   Christy Ouverson.

15   A.    Well, I think I did.

16   Q.    Yeah.

17   A.    I mean, we can go find it.  If I'm confusing the

18   two Christys, I apologize, but we can go find the

19   quote.

20   Q.    Okay.  Let's put it up here.  But your

21   supplemental affidavit was basically put in to rebut

22   Dr. Steward; right?

23   A.    That's right.

24   Q.    Okay.  And here we go.  We got Mrs. Ouverson

25   testified.  Okay.  So that establishes who you were

1    relying on, right, and that's who you listed?

2    A.    Well, who I was quoting, right.

3    Q.    Okay.  Now, it's interesting you did not quote

4    Ms. Ouverson on this point:  "what would the protocol

5    have been" -- this is page 42, lines 9 through 13 --

6    "what would the protocol have been if a manager was in

7    SMD and they were frustrated with it?  What would they

8    do?  What was their alternative to track that

9    information?"

10          "ANSWER:  Their own documents outside the

11   system."

12          Do you recall that?

13   A.    I don't recall seeing that but that sounds

14   familiar, okay?

15   Q.    And did you ask what documents did the people

16   rely upon outside the system?

17   A.    I asked what documents were available.

18   Q.    Okay.  You didn't ask what the -- what the

19   managers actually rely upon?

20   A.    I asked what documents were available to me.  I

21   was going to be doing analyses so I wanted to know

22   what would be available to me.

23   Q.    Okay.  So basically in all of your analyses, you

24   did not actually analyze how the -- what has been

25   called the global develop and coach process actually

124

1    impacted females in the workforce?

2    A.   Well, there isn't a study about the GCG -- what's

3    the acronym?  I'm sorry.

4    Q.   GDCP.

5    A.   Okay.  I haven't done a study of that particular

6    program or of any other particular program, that's

7    correct.

8    Q.   So you don't have any concept of how that program

9    may have led to the gross population statistics that

10   you do report upon?

11   A.   Well, as I said, I haven't studied that

12   particular program or red thread or the various

13   different performance evaluations as such or in

14   particular how they came about to be, who did them, or

15   things like that.  What I studied were the promotion

16   outcomes that actually happened to actual people.

17   Q.   So you didn't study SMD?

18   A.   Well, no, I'm not sure what you mean by that.  I

19   didn't study SM --

20   Q.   Well, you didn't do any statistical analyses of

21   that?

22   A.   Well, that's not entirely correct.  Because as

23   you saw, I looked at these data and found that they

24   were missing a lot of the time.

25   Q.   Okay.

1    A.    So, I mean, that's clearly not a fancy regression

2    analysis.

3    Q.    Right.

4    A.    But given the prevalence of missing data, I

5    thought it would be not very useful to do a regression

6    analysis.

7    Q.    Now, where did you come up with the concept that

8    the data was missing?  Just because the cells were

9    blank?

10   A.    That's right.  I didn't see it there.  Certainly

11   missing in the data sets that I received.

12   Q.    Okay.  So did you ask anyone, why is -- why are

13   these cells not filled, why is there not data for

14   everyone in the customer service department?  Did you

15   ask that question?

16   A.    No.  I don't think I asked that specific

17   question, that's correct.

18   Q.    And you certainly don't know the answer to that

19   specific question today, do you?

20   A.    No.  I haven't studied that.

21   Q.    Okay.  What is your understanding of what SAP is,

22   Doctor?

23   A.    It's a large database management system often

24   used in personnel-type applications.

25   Q.    And other applications as well?

1    A.    Oh, sure.

2    Q.    It's basically a big Oracle type -- is

3    that -- would you relate that to Oracle or --

4    A.    I'm a lot less familiar with Oracle than I am

5    with SAP so I wouldn't want to comment.  But SAP is a

6    personnel-type database with other add-ons too, if the

7    user needs them.

8                    *(Discussion held off the record)*

9              THE COURT:  Let me interject here.

10   Counsel, I have fortunately a University of Chicago

11   master's in economics here clerking for me.  Neither

12   one of you gave me an exhibit book for him.  We're in

13   the middle of the second day.  It would be very

14   helpful to have an exhibit book for the law clerk

15   here.

16             MR. MORGAN:  Oh, certainly.

17                    *(Discussion held off the record)*

18             MR. SMOLEN:  Your Honor, I've got one.

19   We've scratched some notes on some of the pages.  I

20   can give him a clean copy when we're done today but he

21   can certainly use this one for now.

22             THE COURT:  Thank you.  Mr. Morgan.

23             MR. MORGAN:  I apologize, Your Honor.  I

24   should have thought of that.

25             THE COURT:  Go ahead, sir.

1    Q.    *(BY MR. MORGAN)*  Doctor, you've identified

2    Plaintiff's Exhibit 20 as something you looked at; is

3    that correct?

4    A.    Correct.

5    Q.    And you understand that the outcome of this

6    process is to create a pool of persons, a critical

7    point?  Is that your understanding from this, is that

8    it created a pool of potential candidates?

9    A.    Well, that's the intention set out in this

10   document, yes.  That's what the document says.

11   Q.    You don't know one way or the other if that was

12   the case or not, do you?

13   A.    Well, I didn't see a database labeled "pool of

14   potential candidates," no.

15   Q.    So you have to have a database to have a

16   potential pool?

17   A.    Well, what would -- what would one otherwise mean

18   by the term "pool"?  I'm not sure.  For me, the term

19   "pool" would mean a list of people and characteristics

20   of those people.  It might mean something different to

21   Hilti but --

22   Q.    So did you look --

23   A.    -- I can't -- I have to use my own sense of what

24   the term "pool" means here.

25   Q.    Okay.  So there could be very other -- many other

1   different terminologies or pools?  I mean, if you used

2   an Excel spreadsheet showing the potential and the SMD

3   rating and the mobility rating, that could be a pool,

4   could it not?

5   A.    Oh, that's exactly the kind of thing I was

6   talking about.

7   Q.    Yeah.

8   A.    A database.  It doesn't have to be an Excel

9   spreadsheet or something else.  It could be an SAP

10  database, for example.

11  Q.    Did you compare Hilti's numbers to other

12  employers in the construction service business,

13  construction tool business?

14  A.    No, I did not.

15        MR. SMOLEN:  I'm just going to object

16  because that's outside the scope of our direct.  We

17  never inquired as to any studies he would have

18  conducted with other construction companies.

19        THE COURT:  Sustained.  I don't believe

20  that's relevant for a disparate impact analysis.

21        MR. MORGAN:  Thank you.

22  Q.    *(BY MR. MORGAN)* Did you attempt to do any study

23  of correlation between the promotions that actually

24  occurred to the employee's mobility -- designated

25  mobility areas?

1   A.    You mean the M ratings?

2   Q.    M rating, yes.

3   A.    No, I didn't do a study like that.

4   Q.    Didn't do that?

5   A.    No.  I would have had to have discarded most of

6   the data to do such a study.  But I didn't do it.

7   Q.    You could have looked and said, if an employee is

8   M3 to Tulsa and they got a job in Tulsa, then you

9   could have done that type of study, could you not?

10  A.    Well, I would have had to say, among the very

11  small number of people who have an M rating, I get the

12  following correlation.  I could have done that, I

13  guess, yes.  Having seen how widespread the prevalence

14  of missing data was, I would have felt that that

15  wouldn't be a particularly meaningful exercise.

16  Q.    So you didn't even attempt to do that, did you?

17  A.    I did not do that, that's correct.

18  Q.    And, again, you didn't attempt to relate the time

19  of the actual promotion to the person's P rating on

20  the SMD sheets, did you?

21  A.    I'd answer just the same way with the respect to

22  the P rating that I did for the M rating.

23  Q.    So you didn't do it?

24  A.    I didn't do it, that's right.

25  Q.    You didn't do that.

1    A.    And for the same reason.

2    Q.    And that reason being that you assumed that all

3    those blanks were supposed to be filled?

4    A.    No.  I assumed that the blanks meant that there

5    wasn't anything there.  And I think that's

6    unambiguously true, whether or not they were supposed

7    to be filled.

8    Q.    You made no inquiry as to why they were blank?

9    A.    I asked what data were available and I was told

10   this is it.

11   Q.    Just to be clear, your testimony is not designed

12   to make a causal link between the GDCP process and

13   promotions at Hilti?

14   A.    That's correct.  Statistics can't tell you

15   anything about causality per se.

16   Q.    All you studied was this is what happened, this

17   is history, and you applied statistical methods to the

18   number of promotions for males and for females out of

19   those three categories that we discussed, three job

20   areas?

21   A.    Or four, I think, in the case of some of the

22   analyses.

23   Q.    And --

24   A.    There are some analyses that didn't take out --

25   what is it? -- the Hilti -- I'm blocking.

131

1  Q.    Pro shop?

2  A.    Yeah.  Although, as I said, I did take account

3  explicitly of what areas people were in.  So if you

4  like, I allowed the impact to differ depending on

5  which area people were in.  I gave the example of

6  customer service, for instance, where the eagerness or

7  lack of eagerness for promotion might be greater or

8  less than in other areas, which is why I took account

9  of it.

10  Q.    Why do you say might be greater or less?

11  A.    Simply because it's not necessarily the case that

12  everybody is exactly the same in terms of their

13  eagerness or lack of eagerness to do anything.

14  Q.    Right.  So you concede that desire is a factor

15  that should be analyzed?

16  A.    I concede, or I happily agree, that one should do

17  everything one can to take account of as many factors

18  as one can that are in the data, and that's what I

19  believe I did.

20          MR. MORGAN:  I don't think I have anything

21  further, Your Honor.

22          THE COURT:  I have a few questions before

23  we get into redirect and recross.

24      Did you run any other regressions that are not

25  included in your report?

1          THE WITNESS:  No.  The only ones I ran that

2     didn't -- that I didn't include -- I think there's

3     one -- I think I gave an example.  Nobody who was

4     hired in 2008 was actually promoted in 2008 or

5     something like that.  There's a footnote to that fact.

6     And I first ran it not realizing that, and then when I

7     discovered that that had happened, you can put people

8     like that in because they're probability of promotion

9     is zero so I tossed them out.

10         So subject to getting rid of obvious errors, no,

11    I didn't run some parallel set of results and get rid

12    of them.

13         THE COURT:  All right.  So that means that

14    you didn't run any regressions focused only on

15    customer service representatives; correct?

16         THE WITNESS:  That's correct.

17         THE COURT:  Or on pro shop consultants

18    only?

19         THE WITNESS:  That's right.

20         THE COURT:  Or on Hilti center

21    representatives only?

22         THE WITNESS:  That's right.  The way I did

23    it was a little different because I had a variable for

24    each kind of employee in each of those kinds of groups

25    but they were all in one regression.

133

1          THE COURT:  Was the Hilti area variable

2     statistically significant?

3          THE WITNESS:  I'm embarrassed to say I

4     can't recall offhand.  Some of them I think were.

5     There were a set of them.  I would be a little

6     surprised if they weren't jointly statistically

7     significant, but I honestly can't say because it's

8     been awhile since I did that.

9          THE COURT:  All right.  If you looked at

10    Exhibits 44 and 45, would that help you?

11         THE WITNESS:  No, I don't think so.  Those

12    are the ones that did the Cox regressions, if I'm not

13    mistaken.

14         THE COURT:  Correct.

15         THE WITNESS:  Yeah.  Unfortunately, no

16    because that only tells you about the sex coefficient.

17    But what you're asking is about the Hilti area

18    coefficients, and that's not reported there because

19    I'm just summarizing the results.

20         THE COURT:  Your report doesn't contain the

21    sex breakdown for each of the three components of the

22    base market during the relevant time frame, customer

23    service representatives, pro shop consultants, and

24    Hilti center representatives; correct?

25         THE WITNESS:  That's right.

134

         1              THE COURT:  Mr. Smolen, go ahead.

         2              MR. SMOLEN:  May I have just one minute,

         3    Your Honor?

         4              THE COURT:  Yes, sir.

         5              *(Discussion held off the record)*

         6                   **REDIRECT EXAMINATION**

         7    BY MR. SMOLEN:

         8    Q.    Dr. Killingsworth, just a couple real quick

         9    follow-up questions.

        10         I believe you testified that you were retained

        11    to do a rebuttal expert report in response to

        12    Dr. Steward?

        13    A.    That's right.

        14    Q.    Okay.  And did you, in fact, look at the

        15    documents that Dr. Steward looked at when he -- for

        16    what he used to come up with his opinion?

        17    A.    Yes, I did.

        18    Q.    Okay.

        19              MR. SMOLEN:  Your Honor, may I approach?

        20              THE COURT:  Yes, sir.

        21    Q.    *(BY MR. SMOLEN)*  And looking at Dr. Steward's

        22    report, do you see wherein he listed a document in

        23    which he relied on to come to his conclusions titled

        24    "Internal promotions to AM process Tammy REV"?

        25    A.    Tammy REV?

1    Q.    Yes.  It's --

2    A.    Okay.  I see that now.

3    Q.    And if you'd look at the document that I just

4    handed you, what is the title of that document?

5    A.    "Internal promotion to AM process."

6    Q.    Okay.  And in paragraph 1, it indicates that

7    recruiters work with division managers or regional

8    managers on filling vacancies that may occur in the

9    account manager position.  This doesn't happen on

10   every case.  I would say that the majority of the time

11   the BM and UM are communication driven with each

12   other.  Base market is defined as inside sales,

13   customer service representatives, now called inside

14   sales specialists; pro shop consultants, PSC;

15   employees in Hilti -- or excuse me -- home Depot

16   stores; and Hilti center representatives, HCR; both

17   pro shop and HC employees are also called AM I.

18   Correct?

19   A.    Right.

20   Q.    Okay.  And did you take that to define the feeder

21   group for inside sales to account manager position

22   outside sales?

23             MR. MORGAN:  Objection; leading.

24             THE COURT:  Sustained.

25   Q.    *(BY MR. SMOLEN)*  What did that indicate to you,

1    Dr. Killingsworth?

2    A.   Well, that indicated to me that the definition

3    I'd been using for inside sales was the same that's

4    set out here, at least in general terms.  Now, I

5    classified every single job title -- I think I said

6    this this morning -- every single job title that you

7    find in SAP as either inside sales, outside sales, or

8    neither, clericals, let's say.

9    Q.   And your --

10   A.   But this jives perfectly with my understanding of

11   what I was doing.

12   Q.   That's what I'm getting at.  And that essentially

13   the identification of this feeder group by this

14   document that was provided to Dr. Steward by the

15   defendant was also consistent when you actually looked

16   at the raw data; is that correct?

17   A.   That's right.

18             MR. MORGAN:  Objection, Your Honor;

19   leading.

20             THE COURT:  Sustained.

21   Q.   *(BY MR. SMOLEN)*  Was this consistent with what

22   you saw in the raw data?

23             MR. MORGAN:  Objection, Your Honor; same,

24   leading.

25             MR. SMOLEN:  It's not leading.

1          THE COURT:  Overruled.

2   A.    Yes, it was consistent because I looked at all

3   the promotions that -- and every single time when

4   there's an inside sales person that has one of these

5   titles.

6   Q.    (BY MR. SMOLEN)  And did you find in reviewing

7   that that, in fact, these positions were the feeder

8   positions for inside sales promotions to outside sales

9   promotions for internal candidates?

10  A.    Yes.  There, I think I ran across maybe a very

11  small number of people in other titles who became

12  outside sales but it was small.  These are the

13  dominant group of feeder titles.  People in these

14  titles are the feeders.

15  Q.    And you have -- in your practice and in your

16  education, you have routinely developed feeder pools

17  on your own without any company -- have you developed

18  feeder pools on your own?

19  A.    I have.

20          MR. MORGAN:  Your Honor, objection.  This

21  is beyond the scope of cross.

22          THE COURT:  Well, I think it's in response

23  to some of my questions frankly.

24          MR. SMOLEN:  It is.

25          THE COURT:  And my questions with regard to

138

1   regression analyses done on individual component parts

2   were just to determine whether or not, A, those

3   regressions were done but rejected -- I found out they

4   were not -- and B, whether or not if any such

5   regressions had been done, whether or not it

6   altered -- or there was some statistically significant

7   difference having analyzed each one of the component

8   parts.

9            MR. SMOLEN:  And you're correct, Your

10  Honor, this was just in response to the questions that

11  you asked.  So if you're satisfied with that, I don't

12  need to ask anymore questions.

13           THE COURT:  Thank you.  Mr. Morgan.

14           MR. MORGAN:  Nothing further, Your Honor.

15           THE COURT:  Very well.  May this witness be

16  excused?

17           MR. SMOLEN:  Yes.

18           THE COURT:  Thank you, sir.

19      (The testimony of Dr. Killingsworth was concluded)

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3

4              I, Brian P. Neil, a Certified Court Reporter

5    for the Northern District of Oklahoma, do hereby

6    certify that the foregoing is a true and accurate

7    transcription of my stenographic notes and is a true

8    record of the proceedings held in above-captioned

9    case.

10

11             I further certify that I am not employed by

12   or related to any party to this action by blood or

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15

16             In witness whereof, I have hereunto set my

17   hand this 31st day of July 2013.

18                    s/ Brian P. Neil

19             _____

20             Brian P. Neil, RMR-CRR
               United States Court Reporter

21

22

23

24

25