**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

RONICA R. TABOR,                               )
                                               )
            Plaintiff,                         )
                                               )
v.                                             )      Case No. 09-cv-189-GKF-PJC
                                               )
HILTI, Inc. and HILTI OF AMERICA,              )
INC.,                                          )
                                               )
            Defendants.                        )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON PLAINTIFF'S DISPARATE IMPACT CLAIM

On June 24-27, 2013, this matter came before the Court for non-jury trial on the disparate impact claim of plaintiff Ronica Tabor ("Tabor") against the defendants, Hilti, Inc. and Hilti of America, Inc. (collectively, "Hilti"). Tabor alleges disparate impact in promotions on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(k). Hilti denies Tabor's claim.

The court bifurcated Tabor's failure to promote claim from her disparate impact claim and at Tabor's request tried the disparate impact claim first. These findings of fact and conclusions of law resolve the disparate impact claim only.

After considering the pleadings, the testimony and exhibits admitted at trial, the briefs and arguments presented by counsel for both parties, and being fully advised in the premises, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### Facts Relevant to Jurisdiction and Venue

1.      Tabor is a citizen and resident of Oklahoma.

2.      Hilti, Inc. is an Oklahoma corporation with its headquarters in Tulsa, Oklahoma within the Northern District of Oklahoma.

3.      Hilti, Inc. regularly employs more than fifteen people.

4.      Hilti of America, Inc. is a Delaware corporation and is the sole owner of Hilti, Inc.

5.      The alleged facts and circumstances giving rise to this action occurred within Tulsa County, Oklahoma, in the Northern District of Oklahoma.

### Facts Relevant to Hilti's Internal Structure

6.      Hilti is a tool manufacturer.

7.      Hilti maintains Hilti Centers that are free-standing retail stores where Hilti products are sold to the public. Hilti Center Representatives are sales staff at Hilti Centers who interact with customers in person. Testimony of Christy Graybill ("Graybill Testimony") (Tr. Rec. June 26, 2013 at 11:05 AM);[1] Testimony of Christy Ouverson ("Ouverson Testimony") (Tr. Rec. June 25, 2013 at 9:20 AM and 9:28 AM).

8.      Hilti Pro Shops were sections within Home Depot stores set aside for Hilti products.[2] Hilti Pro Shop Consultants were sales staff at Pro Shops who interacted with customers in person. Graybill Testimony (Tr. Rec. June 26, 2013 at 11:06 AM); Ouverson Testimony (Tr. Rec. June 25, 2013 at 9:20 AM and 9:28 AM).

---

[1] As of the date of this order, neither party has ordered a copy of the trial transcript. The court, therefore, cites to the trial recording by date and time.

[2] At the time of trial, Hilti had discontinued its Hilti Pro Shop sales program.

9.      Hilti maintains an internal sales Customer Service Division, staffed by Customer Service Representatives, in Tulsa, Oklahoma. Graybill Testimony (Tr. Rec. June 26, 2013 at 10:59 AM); Ouverson Testimony (Tr. Rec. June 25, 2013 at 9:21 AM and 9:27 AM).

10.     From 2005 to 2010, Hilti employed from approximately 150 to 200 Customer Service Representatives. Graybill Testimony (Tr. Rec. June 26, 2013 at 11:05 AM).

11.     Customer Service Representatives are inside sales personnel who sell products to customers, typically over the phone. *See* Graybill Testimony (Tr. Rec. June 26, 2013 at 11:05 AM); Ouverson Testimony (Tr. Rec. June 25, 2013 at 9:28 AM)

12.     Hilti refers to Customer Service Representatives, Hilti Center Representatives, and Pro Shop Consultants as the "Base Market."[3] Graybill Testimony (Tr. Rec. June 26, 2013 at 11:06 AM); Ouverson Testimony (Tr. Rec. June 25, 2013 at 9:27 AM)

13.     Some Customer Service Representatives pursue promotions within the Customer Service Department.

14.     Some Customer Service Representatives pursue promotions to outside sales Account Manager positions.

15.     Physically, Account Managers must be able to lift 60 pound tools, walk on uneven surfaces, and work at high elevations. Aff. of Shannon DeGiacomo (Pl.'s Exh. #35 at 4-5 ¶21).

**Facts Relevant to the Promotional Process and the Challenged Employment Practice**

16.     Hilti established a performance management and reporting process it called the "global Develop and Coach process" ("GDCP"). GDCP tracks different aspects of an

---

[3] The parties spent considerable time debating whether the term "inside sales" refers to all Base Market employees or only to Customer Service Representatives. The court need not make a finding on the semantic issue, as it is immaterial to the disparate impact claim.

employee's readiness to promote, and is made up of two components: the Performance Management Process ("PMP") and the Strategic Management Development ("SMD") process. Hilti – SMD & Red Thread Process Manual (Pl.'s Exh. #20 at 3); *see also* Testimony of Khesa Pinkard ("Pinkard Testimony") (Tr. Rec. June 24, 2013 at 10:56 AM);.

17.     PMP is a process in which an employee and his or her Team Leader evaluate the employee's past performance and set goals going forward. *See* Pinkard Testimony (Tr. Rec. June 24, 2013 at 11:28 AM); 2007 Tabor PMP Evaluation (Pl.'s Exh. #2). Employees are rated annually by their Team Leader and by himself/herself at either "Below Expectations," "Meets Expectations," or "Exceeds Expectations" in three development target areas. *Id.*

18.     The SMD process identifies employees who are interested in promotional opportunities within Hilti.  Aff. of Shannon DeGiacomo (Pl.'s Exh. #35 at 1 ¶5); Hilti – SMD & Red Thread Process Manual (Pl.'s Exh. #20 at 4). The output of the SMD process is a "pool" or list of employees used as a management tool to track employees interested in promotions.

19.     An employee's inclusion on the SMD list does not signal that an employee is currently promotable or even eligible for promotion. Aff. of Shannon DeGiacomo (Pl.'s Exh. #35 at 1 ¶5). The potential candidates on the SMD list must interview and compete for future jobs. Hilti – SMD & Red Thread Process Manual (Pl.'s Exh. #20 at 5). Thus, the promotional process for prospective Account Managers involves both the GDCP and a separate interview process. The SMD process and the interview process are different processes. *See* Testimony of David Perkins ("Perkins Testimony") (Tr. Rec. June 26, 2013 at 9:27 AM).

20.     The SMD includes two ratings for each employee: an "M-rating" assessing the employee's mobility, and a P-rating (the letter "P" standing for Priority) assessing the employee's promotability. Aff. of Shannon DeGiacomo (Pl.'s Exh. #35 at 2 ¶¶6-10).

21.     The SMD mobility ratings are:

- M1-I        Ready to move anywhere internationally
- M1-D       Ready to move anywhere domestically
- M2-I        Ready to move internationally with restrictions
- M2-D       Ready to move domestically with restrictions
- M3          Not mobile

Hilti – SMD & Red Thread Process Manual (Pl.'s Exh. #20 at 7); Aff. of Shannon DeGiacomo (Pl.'s Exh. #35 at 2 ¶7).

22.     Records on mobility ratings were not required, and employees reported their own mobility ratings. Pinkard Testimony (Tr. Rec. June 24, 2013 at 1:50 PM); Graybill Testimony (Tr. Rec. June 26, 2013 at 11:21 AM and 3:06 PM).

23.     The SMD priority ratings are:

- P1          Ready for next development step within 12 months
- P2          Ready for next development step within 12 - 24 months
- P3          Well placed – no planned movement
- P4          The current performance/potential clearly below expectations
- P5          Not in position long enough to be rated

Hilti – SMD & Red Thread Process Manual (Pl.'s Exh. #20 at 7); Aff. of Shannon DeGiacomo (Pl.'s Exh. #35 at 2 ¶9); Graybill Testimony (Tr. Rec. June 26, 2013 at 11:07 AM).

24.     Unlike mobility ratings, priority ratings were supposed to be kept for all employees. Graybill Testimony (Tr. Rec. June 26, 2013 at 3:05 PM).

25.     Employees rated P3-P5 are not considered currently eligible for promotion. Aff. of Shannon DeGiacomo (Pl.'s Exh. #35 at 2 ¶10).

26.     Employees received a P5 rating during their first six months in a position. Aff. of Shannon DeGiacomo (Pl.'s Exh. #35 at 2 ¶9).

27.     Supervisors assigned P-ratings during the SMD process and maintained SMD records for their employees. *See* Pinkard Testimony (Tr. Rec. June 24, 2013 at 11:05 AM and 2:25 PM).

28.     The Red Thread Dimensions are Hilti's "core values" that "run through everything" in the organization and its employee management. Red Thread Dimensions are used in "the PMP process…, the interview process…, and the SMD process." Graybill Testimony (Tr. Rec. June 26, 2013 at 11:14-11:15 AM); *see also* Perkins Testimony (Tr. Rec. June 26, 2013 at 9:27 AM) ("threads throughout entire process… through the entire organization… from the SMD process to the PMP process to the interview process").

29.     The Red Thread Dimensions are six dimensions used to assess performance and eligibility for promotion. Aff. of Shannon DeGiacomo (Pl.'s Exh. #35 at 5 ¶22). The six dimensions are:

- <u>Understanding and Defining what need to be done</u>: This shows the employee's ability to identify, analyze, prioritize, develop and prepare in regards to a given task, goal or project or their job.

- <u>Getting things done</u>: This shows how the employee implements, monitors, prioritizes, corrects actions, communicates and achieves their goals, tasks or projects in his/her role.

- <u>Working with Others</u>: This shows how the employees demonstrates his/her teamwork, involvement, influencing capabilities and his/her impact in the work environment when dealing with others in the workplace or team situations.

- <u>Developing Yourself & Others</u>: This involves how an employee takes self-responsibility to be proactive in the development of his/her skills and knowledge, how he/she might coach an employee or provide feedback to a team member and also how he/she receives or provides feedback.

- <u>Functional Expertise</u>: This refers to the employee's professional knowledge and his/her skills experience in his/her current role.

- <u>Understanding the Business</u>: This dimension shows the employee's knowledge of Hilti's business model, his/her understanding of what our customers' needs are and also his/her understanding of Hilti's strategy. It also refers to his/her capability to translate that into his/her current role.

Aff. of Shannon DeGiacomo (Pl.'s Exh. #35 at 5 ¶22).

30.     The Red Thread Dimensions are interwoven into both components of the GDCP, the PMP and SMD processes. PMP and SMD evaluations are based on the Red Thread Dimensions. *See* Pinkard Testimony (Tr. Rec. June 24, 2013 at 10:57 AM); Graybill Testimony (Tr. Rec. June 26, 2013 at 11:14 AM); Hilti – SMD & Red Thread Process Manual (Pl.'s Exh. #20 at 8); *see also* Perkins Testimony (Tr. Rec. June 26, 2013 at 9:23 AM).

31.     The Red Thread Dimensions are interwoven into the interview process. *See* Pl.'s Exh. #15. Interviewers rate a candidate on a scale of 1-5 based on the interviewers' judgment of whether the candidate meets or exceeds the criteria for successful job performance within each of the dimensions.

32.     Tabor alleges the GDCP was the employment practice responsible for the alleged disparate impact. Pretrial Order (Doc. #243 at 2).

33.     The SMD component of the GDCP coaches and develops Hilti team members in their career paths. It provides a pool of candidates who are able to interview for promotions. Graybill Testimony (Tr. Rec. June 26, 2013 at 11:04 AM).

34.     The GDCP applied only to internal applicants, and thus did not apply to all prospective Account Managers.

35.     The GDCP's first component, the PMP, had no demonstrable impact on Account Manager hiring decisions. The annual or quarterly performance reviews permitted supervisors and employees to set expectations and discuss goals. But interviewers did not rely on PMP reviews in the interview process. *See* Pinkard Testimony (Tr. Rec. June 24, 2013 at 1:26 PM and 2:05 PM).

36. The GDCP's second component, the SMD, provided M-ratings and P-ratings that affected whether internal applicants would receive an interview for open Account Manager positions. But interviewers in the promotion process did not rely on SMD data in the interview process. *See* Pinkard Testimony (Tr. Rec. June 24, 2013 at 1:26 PM and 2:05 PM). Thus, the GDCP's second component, the SMD did not determine the hiring decisions for Account Manager positions.

37. After the GDCP creates a pool of promotable employees, those employees may apply for a position and may be selected for a promotional interview. Interviews for Account Manager positions were structured around the Red Thread Dimensions. Based on an applicant's answers to the interviewers' questions, interviewers rated the applicant in each dimension. *See* Pinkard Testimony (Tr. Rec. June 24, 2013 at 10:57 AM and 11:10 AM); Testimony of Shannon DeGiacomo ("DeGiacomo Testimony") (Tr. Rec. June 25, 2013 at 10:07-10:08 AM); Perkins Testimony (Tr. Rec. June 26, 2013 at 9:31-9:32 AM).

## Facts Relevant to Available Hilti Data

38. Hilti maintained internal employment and performance management data in several, different databases.

39. Hilti's SAP database contained records on employment, including personnel actions, employment status, job titles, salary information, and a unique employee ID number. Pl.'s Exh. #68; *see also* Ouverson Testimony (Tr. Rec. June 25, 2013 at 9:15 AM and 9:19 AM); Testimony of Dr. Mark Killingsworth ("Killingsworth Testimony") (Doc. #261 at 10-12, 29-31). In the SAP database, "Territory Sales Reps" is another title for Account Managers. Ouverson Testimony (Tr. Rec. June 25, 2013 at 9:20 AM); *see also* Killingsworth Testimony (Doc. #261 at 31).

40.     The SAP database includes PMP ratings, but does not include SMD data. Ouverson Testimony (Tr. Rec. June 25, 2013 at 9:22 AM).

41.     Hilti attempted to feed SMD data into the SAP database, but the attempt failed. Ouverson Testimony (Tr. Rec. June 25, 2013 at 9:23 AM).

42.     Hilti's Applicant Flow Logs ("AFLs") contain data on promotions at Hilti. Pl.'s Exhs. ##69-72; Killingsworth Testimony (Doc. #261 at 65).

43.     The AFLs do not contain employee ID numbers, which makes merging the SAP database and the AFLs more difficult. Killingsworth Testimony (Doc. #261 at 14-18).

44.     The AFLs were incomplete, missing entries for many promoted Account Managers who were identifiable in the SAP database. Pl.'s Exh. #56; Killingsworth Testimony (Doc. #261 at 20, 65-68, 80, 103, 106-108); *id.* at 113-115 (noting Pl.'s Exh. #56 has a typo that reversed the numbers of promoted Account Managers who were in the AFLs and those who were not in the AFLs).

45.     The relevant Customer Service Division SMD records are in evidence. Pl.'s Exhs. ##74-79; Def.'s Exhs. 17-24; Killingsworth Testimony (Doc. #261 at 21-23).

46.     The 2008 SMD records for Base Market positions, including Hilti Centers and Pro Shops, are also in evidence. Pl.'s Exh. #80; Def.'s Exh. #25; Killingsworth Testimony (Doc. #261 at 24-25).

47.     Of the 282 individuals Dr. Killingsworth identified as promoted to Account Manager between 2005 and 2008, 215 have no identifiable P code in the records admitted. Pl.'s Exh. #50; *see also* Killingsworth Testimony (Doc. #261 at 69-70, 75).

**Facts Relevant to Account Manager Promotions**

48.     Hilti preferred to promote from within the company.

49.     Promotions to Account Manager are primarily given to Hilti Customer Service Representatives, Hilti Pro Shop Consultants, and Hilti Center Representatives (collectively, referred to as the "Base Market"). Graybill Testimony (Tr. Rec. June 26, 2013 at 1:55 PM and 2:29 PM); Ouverson Testimony (Tr. Rec. June 25, 2013 at 9:34 AM); Hilti's EEOC Response (Pl.'s Exh. #22 at 2).

50.     Neither party provided reliable, comprehensive data showing which Base Market employees were interested in becoming Account Managers during any relevant time frame.

51.     In calendar years 2005-2008, 1,401 men and 294 women held Base Market positions. During that time, 256 men and 34 women were promoted to outside sales Account Manager positions. Thus, 18.3% of men and 11.6% of women in Base Market positions were promoted to Account Manager positions between January 1, 2005 and December 31, 2008. Pl.'s Exh. #43; Killingsworth Testimony (Doc. #261 at 36-38).

52.     Between October 18, 2007 and December 31, 2008, 1,221 men and 267 women held Base Market positions. During that time, 76 men and 7 women were promoted to outside sales Account Manager positions. Thus, 6.2% of men and 2.6% of women in Base Market positions were promoted to Account Manager positions between October 18, 2007 and December 31, 2008. Pl.'s Exh. #58.

53.     Customer Service Division Manager Christy Graybill kept SMD spreadsheets for the Customer Service Division in 2007-2008. Graybill Testimony (Tr. Rec. June 26, 2013 at 11:19 AM).

54.     The April 17, 2007 Customer Service SMD spreadsheet indicates five (5) females were interested in becoming Account Managers. Of those five, three chose other paths, one left

the company, and one was promoted to Account Manager. Pl.'s Exh. #77; Graybill Testimony (Tr. Rec. June 26, 2013 at 11:40 AM).

55.     The April 17, 2007 Customer Service SMD spreadsheet indicates 21 males were interested in becoming Account Managers. Of those 21, one opted to become a Team Leader in the Customer Service Division and five were promoted to Account  Manager. Pl.'s Exh. #77; Graybill Testimony (Tr. Rec. June 26, 2013 at 11:41-11:43 AM)

56.     From 2005 through 2007, Customer Service Division SMD spreadsheets indicate 12 females showed interest in becoming Account Managers. Of those 12, six chose other positions or left the company and five were promoted to Account Manager. Pl.'s Exhs. ##74-79; Def.'s Exhs. ##17-23; Graybill Testimony (Tr. Rec. June 26, 2013 at 11:46-11:47 AM).

57.     From 2005 through 2007, Customer Service Division SMD spreadsheets indicate 32 males showed interest in becoming Account Managers and did not choose other positions or leave the company, and of those 32, 14 were promoted to Account Manager. Pl.'s Exhs. ##74-79; Def.'s Exhs. ##17-23; Graybill Testimony (Tr. Rec. June 26, 2013 at 11:47 AM).

**Facts Relevant to Dr. Killingsworth's Expert Analysis**

58.     Dr. Killingworth conducted a regression analysis of individuals promoted to account manager positions between 2005-2008.

59.     Dr. Killingsworth studied Base Market positions as feeder positions for Account Manager promotions as a proxy for Account Manager applicants.

60.     Dr. Killingsworth did not control for SMD priority ratings. All Base Market employees should have had SMD priority ratings at all times. Blank records would not be expected. However, Hilti's records are incomplete. Dr. Killingsworth did not (and could not) control for SMD priority ratings because Hilti records did not assign priority ratings to a majority

of Base Market employees. Hilti did not provide an alternative method to account for SMD priority ratings or a more complete data set.

61.     Dr. Killingsworth did not control for SMD mobility ratings. Dr. Killingsworth was unable to control for SMD mobility ratings because Hilti data did not have mobility ratings for a majority of the Base Market employees. Yet only employees who proactively provide a mobility rating have such a rating in Hilti's records. Dr. Killingsworth's decision to not control for mobility leaves a major criteria unaccounted for in his analysis.

62.     Dr. Killingsworth's report finds a statistically significant (at a 95% confidence level) disparate impact based on sex when reviewing Account Managers hired in 2005-2008 compared to the proxy feeder group.

63.     Dr. Killingsworth's report finds a statistically significant (at a 95% confidence level) disparate impact based on sex when reviewing Account Managers hired between October 18, 2007 and December 31, 2008 compared to the proxy feeder group.

## Facts Relevant to Business Necessity Defense

64.     Defendants did not plead a business necessity defense in their original Answer. (Doc. #3).

65.     Defendants did not plead a business necessity defense in their Answer to the Amended Complaint. (Doc. #35).

66.     Defendants did not argue a business necessity justified any purported disparate impact in any of their motions for summary judgment. (Doc. ##24, 95, 96).

67.     Defendants did not include a business necessity defense in their first proposed Pretrial Order submitted to the court.

68.     This court ruled prior to trial that Hilti had waived the affirmative defense of business necessity.

**Facts Relevant to Ronica Tabor Personally**

69.     Tabor is female. Pretrial Order at §III.A. (Doc. #243).

70.     Hilti hired Tabor as a Hilti Center Representative in Dallas, Texas in January 2006. Pl.'s Exh. #22 at 1.

71.     Tabor transferred to the Customer Service Department in Tulsa, Oklahoma in November 2006. Pl.'s Exh. #22 at 1.

72.     Tabor "set up an action plan" to become a Team Leader in Customer Service and interviewed for a Team Leader position in the second quarter of 2007. 2007 Tabor PMP Review (Pl.'s Exh. #2 at 7). As of April 17, 2007, the Customer Service SMD spreadsheet indicated Tabor wished to develop toward becoming a Team Leader within Customer Service. Pl.'s Exh. #77.

73.     Tabor was rated a P1 as of April 17, 2007. Pl.'s Exh. #77; Pretrial Order at §IV.A. (Doc. #243).

74.     During the third quarter of 2007, Tabor changed her career plan from becoming a Team Leader in Customer Service to becoming an outside sales Account Manager. 2007 Tabor PMP Review (Pl.'s Exh. #2 at 7); Graybill Testimony (Tr. Rec. June 26, 2013 at 11:09 AM).

75.     In the Fall of 2007, Tabor applied for an Account Manager position.

76.     On November 14, 2007, Tabor interviewed for Account Manager positions in Oklahoma City and Arkansas. Pretrial Order at §III.C. (Doc. #243).

77.     On November 14, 2007, Division Manager Glen Teel and Regional Manager David Perkins interviewed three individuals: Ronica Tabor, Berkeley Smith, and Paulette Michelle Musso.

78.     Tabor was not hired for either Account Manager position following her interview. Pretrial Order at §III.D. (Doc. #243)

79.     Berkeley Smith and Paulette Musso were offered Account Manager positions.

80.     Tabor and her Customer Service team leader Jennifer Patuto signed an annual PMP review for Tabor on January 31, 2008. 2007 Tabor PMP Review (Pl.'s Exh. #2 at 1, 7).

81.     The PMP review articulated development targets in each Red Thread Dimension. 2007 Tabor PMP Review (Pl.'s Exh. #2).

82.     The PMP review indicates Tabor was mobile with a geographic preference for "North TX, OK, AR, North AL, MS." 2007 Tabor PMP Review (Pl.'s Exh. #2 at 5).

83.     In the PMP review, Tabor's team leader Jennifer Patuto states "I feel she would be an AM by Q1 or Q2 or [sic] 2008." 2007 Tabor PMP Review (Pl.'s Exh. #2 at 7).

84.     Tabor resigned from Hilti effective April 5, 2008. Def.'s Exh. #9.

## CONCLUSIONS OF LAW

### The Court Has Jurisdiction and Venue Is Proper

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

2.      Venue is proper pursuant to 28 U.S.C. § 1391.

### The Disparate Impact Standard

3.      A claim of disparate impact exists when a facially neutral employment practice causes a disparate impact on members of a protected group. *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971); 42 U.S.C. §2000e-2(k). Congress has "proscrib[ed] not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Id.* at 431. Disparate impact claims are premised on the fact that "some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Pippin v. Burlington Res. Oil and Gas Co.*, 440 F.3d 1186, 1199 (10th Cir. 2006) (quoting *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1242 (10th Cir. 1991)).

4.      To establish a prima facie case of disparate impact, Tabor must demonstrate that Hilti uses a particular employment practice that causes a disparate impact the basis of sex. 42 U.S.C. §2000e-2(k)(1)(A)(i). Tabor may rely on statistics to show that the challenged practice causes a disparate impact.

5.      Tabor bears the initial burden of establishing a prima facie case of disparate impact discrimination. She must establish by a preponderance of the evidence that Hilti "uses a particular employment practice that causes a disparate impact on the basis of… sex." 42 U.S.C. § 2000e-2(k)(1)(A)(i).

6.      Once Tabor establishes that prima facie case, the burden shifts to Hilti to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." *Id.*

## GDCP Is An Employment Practice

7.      The GDCP is an employee development process.

8.      The GDCP generates a pool of internal candidates for promotion and provides guidance for employees on how to best position themselves for promotion.

9.      Account Managers are hired through a discretionary interview process that involved questions based on the Red Thread Dimensions.

10.     The interview process is separate and not part of the GDCP.

11.     Because the GDCP is an employee development process that generates a talent pool of internal candidates who may be interviewed for promotions, it functions as an employment practice. According to Hilti policy, having the proper mobility and priority rating is a prerequisite for promotion. Those SMD ratings, a component of the GDCP, affects whether an internal applicant can be promoted.

## The Evidence Is Insufficient To Demonstrate the GDCP Caused A Disparate Impact

12.     Dr. Killingsworth's expert report is methodologically sound and reliable.

13.     Neither party provided data on the actual applicant pool for Account Manager positions during any period within the 2005-2008 time frame.

14.     Defendants' reliance on *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000) is misplaced. In *Joe's Stone Crab*, the Eleventh Circuit reversed the district court for throwing out data on the gender makeup of the actual applicant pool of restaurant servers and instead relying on the gender makeup of women in the area who were qualified to be servers. *Id.* at 1276 ("the district court could create a statistically-significant disparity only by first throwing

out the actual applicant data as a point of comparison and instead comparing the percentage of women hired for server positions at Joe's with the percentage of women in the 'qualified' labor pool."). Here, by contrast, the record does not contain a complete list of all actual applicants for Account Manager positions. Thus, reliance on a close proxy is appropriate. *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1197 (10th Cir. 2006) ("a statistical analysis cannot establish a plaintiff's prima facie case unless it is based on data restricted to qualified employees, or (1) reliable data with respect to that group are unavailable and (2) the plaintiff establishes that the statistical analysis uses a reliable proxy for qualification").

15.     Because employees promoted to Account Manager came primarily from Base Market positions, the Base Market is a proper proxy for the applicant pool. *See Shidaker v. Tisch*, 833 F.2d 627, 631 (7th Cir. 1986) ("Where a company is shown to promote from within, the relevant labor pool of qualified applicants for upper level positions may be the group of employees in the company from which promotees will be drawn").

16.     Dr. Killingsworth's report properly focuses on Base Market positions as feeders. For disparate impact purposes, Hilti's focus on Customer Service Representatives is underinclusive because Hilti Center Representatives and Pro Shop Consultants were regularly promoted into Account Manager positions.

17.     Dr. Killingsworth's regression analysis controlled for important variables other than sex that could impact promotion rates.

18.     Dr. Killingsworth's inability to control for SMD priority ratings does not render his analysis unreliable. Hilti's incomplete data set cannot inoculate defendants from an otherwise appropriate statistical study on the possible disparate impact of the GDCP.

19. Dr. Killingsworth's decision to not control for SMD mobility ratings does not render his analysis unreliable. In a regression analysis, mobility preferences would only change the statistical significance of the sex variable if mobility preferences differed by sex. However, Hilti provides no trustworthy data demonstrating that the mobility preferences of women differ from men among Base Market employees. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1226 (10th Cir. 2013) ("Title VII does not permit us to presume that female inside sales representatives are significantly less able or willing than their male colleagues to relocate..."). Because the court may not presume such differences, the failure to control for mobility preferences does not make Dr. Killingsworth's analysis unreliable.

20. Dr. Killingsworth, however, did not isolate the GDCP. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1223 (10th Cir. 2013) ("The requirement to isolate the challenged employment practice is important because it goes directly to causation."). Dr. Killingsworth's report compares eventual Account Managers to the proxy of Base Market employees. The GDCP outputs a pool of potentially promotable employees. To move from Base Market to Account Manager requires an employee to go through an additional process – the interview process –which is separate from the GDCP. And external applicants are not directly subject to the GDCP at all.

21. Because Dr. Killingsworth does not isolate the GDCP from the interview process, the disparate impact may be caused by one or both of those processes. And without knowing which of those processes cause the alleged disparate impact, the court would be unable to fashion an appropriate equitable remedy.

22. Because Tabor bears the burden of isolating the challenged employment practice, and the GDCP process has not been isolated here, the court concludes Tabor has not demonstrated that the GDCP causes a disparate impact.

23.     Dr. Killingsworth's regression analysis fails to separate the GDCP and the interview processes. Thus, the regression analysis results could be caused by the GDCP, the interview, or a combination of the two. *See* Killingsworth Testimony (Doc. #261 at 124) ("I haven't studied [GDCP] or red thread or the various different performance evaluations as such or in particular how they came about to be, who did them, or things like that. What I studied were the promotion outcomes that actually happened to actual people.").

24.     Because the statistical evidence does not isolate the GDCP, Tabor has not carried her burden of demonstrating that the GDCP causes a disparate impact on female feeder pool applicants who apply for outside sales Account Manager positions.

### Defendants Waived The Affirmative Defense of Business Necessity

25.     Where a plaintiff establishes a prima facie case, the burden shifts to defendants "to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i).

26.     The business necessity defense is an affirmative defense that can be waived. *See Lewis v. City of Chicago, Ill.*, 560 U.S. 205, 130 S. Ct. 2191, 2198, 176 L. Ed. 2d 967 (2010); *see also El v. SEPTA*, 479 F.3d 232, 237 (3rd Cir. 2007); *Ojo v. Farmers Grp., Inc.*, 565 F.3d 1175, 1191 (9th Cir. 2009); *Ricci v. DeStefano*, 530 F.3d 88 (2nd Cir. 2008); *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 131 (3rd Cir. 1996).

27.     An affirmative defense is not necessarily waived by a failure to plead it in an answer, and "a defendant may raise [an affirmative defense] by a motion to dismiss, a motion for summary judgment or by answer." *Smith v. Spain*, 133 F.3d 933, at *1 (10th Cir. 1998) (unpublished); *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1076 (10th Cir.

2009) ("when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue").

28.     Hilti waived the business necessity defense by not pleading it, not raising it at summary judgment, and not raising it until days before trial.

### Tabor Was Not Personally Affected By The Challenged Employment Practice

29.     Where the disparate impact doctrine has been used in individual actions rather than class actions, a disparate impact plaintiff may not receive individual relief unless she shows that she "personally has been the victim of discrimination by the [challenged employment] practice." *Coe v. Yellow Freight Sys., Inc.,* 646 F.2d 444, 451 (10th Cir. 1981); *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1221 (10th Cir. 2013).

30.     Tabor applied for an Account Manager position, participated in the GDCP, earned the highest priority rating possible, and interviewed for the Account Manager positions. Thus, through the GDCP, Tabor secured an interview for the Account Manager positions.

31.     As previously stated in the findings of fact, Tabor was not hired as an Account Manager position after the discretionary interview process. That decision resulted from the interview process, not the GDCP. Therefore, even if Tabor had demonstrated the GDCP caused a disparate impact on female Account Manager applicants, that discrimination would not have applied to her personally.

In summary, Tabor has not met her burden of demonstrating that the GDCP caused a disparate impact on female employees. Tabor properly identified the feeder pool to Hilti Account Manager positions, and studied the best possible proxy group for applicants to Account Manager positions given the company's data collection. Tabor also showed a statistically significant

difference between the sex makeup of the feeder pool and Account Managers. Finally, Tabor controlled for most other possible explanations of the identified discrepancy.

However, the statistical evidence did not isolate the identified employment practice – the GDCP – from the discretionary interview process. Therefore, Dr. Killingsworth's study combined the effects of the GDCP and the interview process with no way to tease out the effect of each.

Finally, the GDCP – as opposed to the interview – did not impede Tabor's promotion. She received the highest SMD rating possible and was counted in the pool of potentially promotable internal applicants. Thus, even if Tabor had shown that the GDCP caused a disparate impact, she has not shown she personally has been victimized by the GDCP.

Accordingly, defendants are entitled to judgment on plaintiff's disparate impact claim. Tabor's failure to promote claim is set for jury trial.

DATED this 12th day of August, 2013.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT